COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

THE STATE OF TEXAS,
)
 No. 08-01-00212-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 409th District Court

)


CERJIO MARTINEZ,
)
 of El Paso County, Texas

)


 Appellee.
)
 (TC# 2000-0D0-4570)


O P I N I O N



 In this case of wide public interest bearing overtones of scandal and political intrigue, we
consider whether conversations between a deputy police chief of the El Paso Police Department and
an Assistant City Attorney are protected by the attorney-client privilege. Confidential information
was leaked to the local newspaper and a television station concerning an ongoing investigation into
administrative issues within the police department. Deputy Chief Cerjio Martinez and Assistant
Chief George DeAngelis were considered possible suspects. A criminal investigation into the leak
itself focused on misuse of official information proscribed by Section 39.06 of the Texas Penal Code. 
Neither Martinez nor DeAngelis was indicted for that offense. Instead, they were indicted for
aggravated perjury based on inconsistencies between sworn statements to the grand jury and
surreptitiously tape-recorded conversations with El Paso Assistant City Attorney, Stephanie Osburn. 
After indictment, Martinez filed a motion to suppress all evidence obtained from Osburn based upon
attorney-client privilege. Following evidentiary hearings, the trial court suppressed all of Martinez's
statements to and conversations with Osburn.

 The State has filed several interlocutory appellate proceedings arising from the prosecution
of Martinez. By separate order, the trial court suppressed Martinez's statement to the grand jury. 
We originally affirmed, but the Court of Criminal Appeals affirmed in part and reversed in part. 
State v. Martinez, 92 S.W.3d 10 (Tex.App.--El Paso 2001), aff'd in part, rev'd in part, 91 S.W.3d
331 (Tex.Crim.App. 2002). The case is now pending before us on remand on the issue of whether
Martinez's statement was voluntary and it will be addressed by separate opinion. The State also
sought mandamus relief, contending that the trial court lacked jurisdiction to render the order
appealed from here because of the pendency of its first interlocutory appeal involving the grand jury
statement. We denied relief. In re The State of Texas, 50 S.W.3d 100 (Tex.App.--El Paso
2001, orig. proceeding). This appeal was previously dismissed for want of jurisdiction based upon
then-existent precedent. (1) The Court of Criminal Appeals reversed and remanded for consideration
on the merits. State v. Martinez, 53 S.W.3d 903 (Tex.App.--El Paso 2001), rev'd, 70 S.W.3d 894
(Tex.Crim.App. 2002). We now undertake that task. We have endeavored to offer a complete
factual summary but large portions of the record were sealed by the trial court, including grand jury
testimony. We have reviewed all documents under seal but will avoid direct reference to them.


FACTUAL SUMMARY


 Cerjio Martinez has been an officer with the El Paso Police Department for over twenty
years. In January 2000, he was promoted to deputy chief. In his new position, he supervised over
200 officers assigned to Central Command, including five commanders and four captains. George
DeAngelis was an assistant chief in the El Paso Police Department. (2) He has also been indicted
for perjury; his case proceeds separately and is presently before us in State v. DeAngelis, Cause No.
08-01-00205-CR.

 Stephanie Osburn began employment as an Assistant City Attorney in April 1999. She
described her job as representing the City of El Paso on department disciplinary matters, criminal
subpoenas, and expungements. She was assigned to Internal Affairs at the police department and
maintained an office there as well as at City Hall. Police officers were agents of the City who fell
within the representation umbrella. Osburn dispensed legal advice to the upper echelons of the
police department--captains and above. As was common practice within the City Attorney's Office,
Assistant City Attorneys routinely addressed documents to individual police officers bearing a label
that the communications were privileged. Osburn thought she had major input into the decisions
made by the police leadership and hoped they would act on her advice. 

 In January 2000, DeAngelis showed Osburn a memo he had written to Chief of Police
Carlos Leon on August 31, 1999. In the memo, he formally requested that Chief Leon remove
Officer Luis Cortinas from his position as Leon's administrative assistant due to his involvement in
activities which could bring discredit to the department. DeAngelis acknowledged that he had met
with the FBI before writing the letter and his suspicions about Cortinas had been confirmed. By
January, DeAngelis was concerned about the status of the investigation and discussed the issue with
Osburn. Osburn began communicating with DeAngelis on a daily basis. DeAngelis often criticized
Chief Leon in his conversations with Osburn. After Martinez was promoted to deputy chief in
January 2000, he also began dealing with Osburn on a frequent basis. Osburn testified that she was
"dealing with Chief Martinez as a lawyer and on legal matters involving the El Paso Police
Department." While the record is silent on the details, it does reveal that Osburn was also engaged
in a personal relationship with Martinez from January until April 2000. They spoke daily, discussed
"all kinds of issues" and more than just City business. Like DeAngelis, Martinez had no hesitation
about criticizing Chief Leon in his conversations with her.

 In April 2000, DeAngelis lodged a formal complaint with the City concerning the
administrative issues raised in his August 1999 memo as well as other serious allegations of
misconduct by Chief Leon. Assistant City Attorney Chris Borunda began an investigation and Chief
Leon and DeAngelis were placed on paid administrative leave by the mayor. Borunda submitted her
report to the mayor, who publicly reprimanded Chief Leon on June 26, 2000. Osburn, DeAngelis,
and Martinez criticized the accuracy and credibility of Borunda's investigation. DeAngelis thought
that little action had been taken against Chief Leon and he was frustrated with the results, which he
termed a "whitewash."

 The very next day, an El Paso television station reported that it had received a sixteen-page
confidential report relating to a criminal investigation of Officer Cortinas. The report was
purportedly leaked by an anonymous source within the El Paso Police Department. The El Paso
Times printed the story on June 28, 2000. On the same day, it submitted an open records request
about other allegations of misconduct. Assistant Police Chief Richard Wiles initiated a separate
investigation into the leak. (3) Wiles assigned Lieutenant David Norman to the investigation. (4) While
the investigation was pending, Osburn was relieved of her duties with the El Paso Police
Department. (5) Although she told DeAngelis, she did not notify Martinez of her reassignment. 

 In July, Martinez went to see Osburn at her office to discuss what he perceived to be
retaliatory actions toward him by Chief Leon as a result of his participation in Borunda's
investigation. Osburn escorted Martinez to Borunda's office and sat with him while he filed a formal
complaint. When Martinez asked Borunda for legal advice, she told him that she could never give
City employees individual legal advice. He then expressed his concerns to Osburn and wanted to
know what he needed to do. Osburn advised him to document any retaliatory actions and suggested
that he classify any statements as "whistle blower" information. On July 6 or 7, Martinez called
Osburn and asked if she would be willing to talk to the media about the flaws in Borunda's
investigation. She declined and reported the request to Detective George Althoff. 

 On August 2, Norman confronted Osburn and accused her of misusing official information. 
He threatened her with criminal prosecution and the loss of her job and law license. When Osburn
asked what he wanted her to do, Norman presented her with an immunity agreement prepared in
advance and urged her cooperation in tape recording a conversation with Martinez. Osburn did not
discuss these events with anyone else in the City Attorney's office before agreeing to participate. 
The call was placed from City Hall and Norman orchestrated the conversation. Martinez was not
aware that the conversation was being recorded. Osburn began by telling Martinez that she was
working late, to lead him to believe that the purpose of the call was not social. She then told him
that the City had just received an open records request from one of the television stations. The
conversation turned to contact with the media concerning Borunda's investigation and Osburn's
criticism of that investigation. Osburn inquired whether Martinez still wanted her to speak with a
reporter. Martinez advised her that she shouldn't talk to the media unless she was willing to do so
and certain that her name would not be revealed. Martinez explained that the only details he had
provided to the media were general descriptions of administrative procedure, his opinion that
Borunda's investigation was less than thorough, (6) and his comment to a reporter that Osburn might
be willing to talk if she remained anonymous. Osburn also took the opportunity to discuss with
Martinez his employment issues, and asked whether Chief Leon was still "bothering" him. Martinez
told her that Leon was scrutinizing his work and would not interact with him at all. At the end of
the telephone conversation, Osburn asked to meet with Martinez and he suggested that they have
lunch the next day. Norman placed a wire in Osburn's purse in order to record the luncheon
conversation. (7) Later that afternoon, Norman and Buster Collins, a Texas Ranger, visited Martinez
at police headquarters. Norman transcribed his notes from the interview into a statement entitled
"sworn statement to the grand jury." He took it to Martinez's home a few days later so that Martinez
could review and edit the statement. The corrected statement was duly signed and notarized. 

 Based on alleged inconsistencies between the taped conversations with Osburn and the
"sworn statement to the grand jury," Martinez was indicted for aggravated perjury. On August 18,
2000, his defense counsel--Luis Aguilar--wrote a letter to Osburn in which he advised her that he
was now representing Martinez. Osburn replied by letter dated August 22, informing Aguilar "that
my client has always been the City of El Paso, not Mr. Martinez." In a second letter dated
September 7, she clarified the attorney-client relationship:

 As counsel for the City of El Paso, it is my job to represent various departments in
various issues and proceedings. In my position as counsel for the El Paso Police
Department, it fell upon me to provide legal advice to many individual members of
the Department. That advice was given to those individuals in their capacity as
representatives of the El Paso Police Department, not in their individual capacity.


 Therefore, while I have provided legal advice to Cerjio Martinez on several
occasions, I gave that advice to him in his capacity as representative of the
Department. I reiterate that at all times, my client has been the City of El Paso, not
Cerjio Martinez.


 At the hearings on the motion to suppress, Assistant City Attorney Elaine Hengen testified
that her only client was the City of El Paso. She opined that there was no privilege with respect to
any of the statements on the tape recordings and that she had been authorized by City Attorney
Charles McNabb to not assert any privilege as to the contents. In her view, the privilege only applied
to police department employees if the employees were acting within their authority to seek legal
services or were given authority to act on legal advice. City Attorneys were not allowed to represent
employees in their individual capacities for matters outside of City business. Hengen did not believe
that the taped conversations presented any evidence of a crime or fraud. 

 Chief Leon and Assistant Chief Wiles both testified that they had sought advice from Osburn
when it involved official police business. Osburn's area of expertise was arbitrating employee
disciplinary actions. She participated in regular disciplinary review meetings in order to assess
uniform discipline throughout the regional commands. Confidential information was often revealed
to the City Attorney's office relating to investigations of police officers. Chief Leon expected that
any discussion that he had with the City Attorneys which was legal in nature would be confidential. 
 Osburn testified that it was her duty to provide legal advice to many individual members of
the police department. She acknowledged writing the letters in which she claimed to represent the
City, and not Martinez and DeAngelis as individuals, although she had never told them that. At the
time of the hearing, however, her perception was "that I do have an understanding of how
Mr. Martinez and Mr. DeAngelis could assume that there was a privilege existing and that based on
that assertion, I have to assume that the comments they made to me they felt were in confidence." 
 The trial court suppressed the communications between Martinez and Osburn as well as the
fruits therefrom on the basis of the attorney-client privilege. The State now appeals. 

STANDARD OF REVIEW


 The litigants disagree over the appropriate standard of review. The State argues that although
the issue is not entirely settled, we are to review de novo the applicability of the attorney-client
privilege and the exclusion of evidence resulting from a violation of the privilege. Martinez
contends that we should review an interlocutory appeal from a pre-trial order excluding evidence for
an abuse of discretion. Looking to the Court of Criminal Appeals for direction, we believe de novo
review to be appropriate. In Henderson v. State, (8) the court began by noting that at least one federal
circuit holds that "mixed questions of law and fact, regarding the applicability of the attorney-client
privilege to particular communications" must be reviewed de novo. Cox v. Administrator U.S. Steel
& Carnegie, 17 F.3d 1386, 1413 (11th Cir.), opinion modified on other grounds, 30 F.3d 1347
(1994), cert. denied, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). It also recognized its
own precedent in applying de novo review to mixed questions of law and fact. Villarreal v. State,
935 S.W.2d 134, 138 n.5 (Tex.Crim.App.1996)(plurality opinion); id. at 139-41 (McCormick, J.
concurring); id. at 141-45 (Clinton, J. concurring); id. at 145-50 (Keller, J. concurring). With regard
to motions to suppress, however, we review a trial court's ruling for an abuse of discretion.
Villarreal, 935 S.W.2d at 138; Brewer v. State, 932 S.W.2d 161, 166 (Tex.App.--El Paso 1996, no
pet.). The trial judge is the sole and exclusive trier of facts at a suppression hearing. Romero v.
State, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990); Brewer, 932 S.W.2d at 166. Therefore, an
appellate court must defer to a trial court's determination of historical facts supported by the record,
especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. 
Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997); Gordon v. State, 4 S.W.3d 32, 35
(Tex.App.--El Paso 1999, no pet.). Accordingly, we will defer to the trial court's determination of
historical facts, but review de novo the application of law to those facts.

ATTORNEY-CLIENT PRIVILEGE


 Martinez contends that his conversations with Osburn, including the tape recordings, are
protected by attorney-client privilege. Invocation of the privilege is dependent upon the existence
of an attorney-client relationship, which has been defined as a contractual relationship whereby an
attorney agrees to render professional services for a client. Tanox, Inc. v. Akin, Gump, Strauss,
Hauer & Feld, 105 S.W.3d 244, 254 (Tex.App.--Houston [14th Dist.] 2003, pet. filed), citing Mellon
Serv. Co. v. Touche Ross & Co., 17 S.W.3d 432, 437 (Tex.App.--Houston [1st Dist.] 2000, no pet.).

Formation of the Attorney-Client Relationship


 The relationship may be expressly created by contract, or it may be implied from the actions
of the parties. Tanox, 105 S.W.3d at 254, citing Sutton v. Estate of McCormick, 47 S.W.3d 179, 182
(Tex.App.--Corpus Christi 2001, no pet.); Vinson & Elkins v. Moran, 946 S.W.2d 381, 405
(Tex.App.--Houston [14th Dist.] 1997, writ dism'd by agr.). The determination of whether there is
a meeting of the minds must be based on objective standards of what the parties did and said and not
on their alleged subjective states of mind. Terrell v. State, 891 S.W.2d 307, 313 (Tex.App.--El Paso
1994, pet. ref'd). A question of fact exists when the evidence does not conclusively establish the
existence of an attorney-client relationship. Tanox, 105 S.W.3d at 254; Sutton, 47 S.W.3d at 182;
Kanow v. Brownshadel, 691 S.W.2d 804, 805-06 (Tex.App.--Houston [1st Dist.] 1985, no writ).

Scope of the Privilege


 The scope of the attorney-client privilege is defined by the rules of evidence. Tex.R.Evid.
503. The privilege is intended to allow unrestrained communication and contact between the
attorney and client in all matters in which the attorney's professional advice or services are sought,
without fear that these confidential communications will be disclosed by the attorney, voluntarily
or involuntarily, in any legal proceeding. Huie v. DeShazo, 922 S.W.2d 920, 922 (Tex. 1996); In
re Toyota Motor Corp., 94 S.W.3d 819, 822 (Tex.App.--San Antonio 2002, pet. denied). Rule 503
protects confidential communications "made for the purpose of facilitating the rendition of
professional legal services to the client." Tex.R.Evid. 503(b)(1); Huie, 922 S.W.2d at 922; In re
ExxonMobil Corp., 97 S.W.3d 353, 357 (Tex.App.--Houston [14th Dist.] 2003, no pet.). The
privilege applies not only to legal advice, but attaches to complete communications between an
attorney and the client. In re Carbo Ceramics Inc., 81 S.W.3d 369, 374 (Tex.App.--Houston [14th
Dist.] 2002, no pet.); GAF Corp. v. Caldwell, 839 S.W.2d 149, 151 (Tex.App.-- Houston [14th Dist.]
1992, orig. proceeding). The subject matter of the information contained in the communication is
irrelevant when determining whether the privilege applies. See Marathon Oil Co. v. Moye, 893
S.W.2d 585, 589 (Tex.App.--Dallas 1994, no writ).

 For a communication to be privileged, it must appear that the communication was made by
a client seeking legal advice from a lawyer in her capacity as such and the communication must
relate to the purpose for which the advice is sought; the proof, express or circumstantial, must
indicate the client's desire for confidence and secrecy. Duval County Ranch Co. v. Alamo Lumber
Co., 663 S.W.2d 627, 634 (Tex.App.--Amarillo 1983, writ ref'd n.r.e.); Ballard v. Ballard, 296
S.W.2d 811, 816 (Tex.Civ.App.--Galveston 1956, no writ). A communication is confidential if not
intended to be disclosed to third persons other than those to whom disclosure is made in furtherance
of the rendition of professional legal services to the client or those reasonably necessary for the
transmission of the communication. Tex.R.Evid. 503(b)(1). The attorney-client privilege confers
upon the client the right to prevent disclosure of communications at any stage of the criminal
proceedings.

Identity of the Client


 Having addressed the formation of the relationship and the nature of confidential
communications, we come to the pricklier issue of the role of the government lawyer and the
identification of the client. A "client" is:

 [A] person, public officer, or corporation, association, or other organization or entity,
either public or private, who is rendered professional legal services by a lawyer, or
who consults a lawyer with a view to obtaining professional legal services from that
lawyer.


Tex.R.Evid. 503(a)(1). A "representative of the client" is (A) a person having authority to obtain
professional legal services, or to act on advice thereby rendered, on behalf of the client, or (B) any
other person who, for the purpose of effectuating legal representation for the client, makes or
receives a confidential communication while acting in the scope of employment for the client. 
Tex.R.Evid. 503(a)(2)(A), (B). The Texas Disciplinary Rules of Professional Conduct also address
the issue:

 Rule 1.12. Organization as a Client


 (a) A lawyer employed or retained by an organization represents the entity. While
the lawyer in the ordinary course of working relationships may report to, and accept
direction from, an entity's duly authorized constituents, in the situations described
in paragraph (b) the lawyer shall proceed as reasonably necessary in the best interest
of the organization without involving unreasonable risks of disrupting the
organization and of revealing information relating to the representation to persons
outside the organization.


 (b) A lawyer representing an organization must take reasonable remedial actions
whenever the lawyer learns or knows that:


 (1) an officer, employee, or other person associated with the
organization has committed or intends to commit a violation of a
legal obligation to the organization or a violation of law which
reasonably might be imputed to the organization;


 (2) the violation is likely to result in substantial injury to the
organization; and


 (3) the violation is related to a matter within the scope of the lawyer's
representation of the organization. 


. . .



 (e) In dealing with an organization's directors, officers, employees, members,
shareholders or other constituents, a lawyer shall explain the identity of the client
when it is apparent that the organization's interests are adverse to those of the
constituents with whom the lawyer is dealing or when explanation appears
reasonably necessary to avoid misunderstanding on their part.


Tex.Disciplinary R.Prof'l Conduct 1.12. Comment 3 advises that when an employee of the
entity communicates with the entity's attorney in the employee's organizational capacity, the
communication is privileged. But comment 4 cautions that there are times when the entity's interest
may become adverse to that of its employee:

 Clarifying the Lawyer's Role


 4. In such circumstances the lawyers should advise any constituent, whose
interest the lawyer finds adverse to that of the organization of the conflict or potential
conflict of interest, that the lawyer cannot represent such constituent, and that such
person may wish to obtain independent representation. Care should be taken to
assure that the individual understands that, when there is such adversity of interest,
the lawyer for the organization cannot provide legal representation for that
constituent individual, and that discussions between the lawyer for the organization
and the individual may not be privileged insofar as that individual is concerned. 
Whether such a warming [sic] should be given by the lawyer for the organization to
any constituent individual may turn on the facts of each case.


While comment 9 acknowledges that "defining precisely the identity of the client and prescribing
the resulting obligations of such lawyers may be more difficult in the government context," it
suggests a different balance may be appropriate between maintaining confidentiality and assuring
that a wrongful official act is prevented inasmuch as public business is involved. Tex.Disciplinary
R.Prof'l Conduct 1.12 cmt. 9. Hengen and Borunda clearly understood this requirement. We
cannot say the same for Osburn. (9)

 Osburn initiated communications with Martinez in her capacity as an Assistant City Attorney
when she was first notified of the allegations made against Chief Leon. She began speaking with
him daily, first as an attorney and then as a friend. Throughout that time, Martinez sought her advice
on internal issues within the police department and on his own employment issues, including
potential "whistle blower" claims. They shared with one another their criticisms of Chief Leon and
his management of the police department. They vented their frustrations with what they perceived
as Borunda's hasty and less than thorough investigation. Although Osburn was ultimately relieved
of her assignment to the El Paso Police Department, she never relayed that information to Martinez. 
Nor did she ever explain to him that she could not provide him with personal legal advice. Instead,
she referred to Martinez on several occasions as "her client." (10) In the aftermath of the immunity
agreement which required Osburn to fully cooperate and testify for the prosecution, Osburn told the
grand jury that Martinez was never her client. But by the time of the suppression hearing, she had
had second thoughts. Ultimately, she admitted Martinez could well have believed that the attorney-client privilege protected comments made to her in confidence. And significantly, Hengen testified
that if a City Attorney engaged in individual representation in violation of City policy, the attorney-client privilege would protect their communications. In other words, a violation of City policy
prohibiting individual representation would not defeat the privilege.

 According the appropriate deference to the trial court's determination of these historical facts
and its unique ability to observe the credibility, demeanor and sincerity of the witnesses, we find
ourselves unable to fault Judge Medrano's conclusion that Martinez's conversations with Osburn
and any fruits stemming therefrom were protected by attorney-client privilege.

 CRIME-FRAUD EXCEPTION


 The State next contends that Martinez sought Osburn's assistance in releasing confidential
information to the media thus implicating the crime-fraud exception to the attorney-client privilege: 

 (d) Exceptions. There is no privilege under this rule: 

 (1) Furtherance of crime or fraud. If the services of the lawyer were sought or
obtained to enable or aid anyone to commit or plan to commit what the client knew
or reasonably should have known to be a crime or fraud. 


Tex.R.Evid. 503(d)(1). The plain language of the rule indicates that a continuing or future crime
is not enough; the attorney's services must be sought to aid in the commission of the crime. 
Henderson, 962 S.W.2d at 553. The lawyer's knowledge of the client's purpose may enable the
lawyer to prevent the commission of the prospective crime. When the threatened injury is grave, the
lawyer's interest in preventing the harm may be more compelling than the interest in preserving the
confidentiality of information. Id. at 554-55.

 In order for the exception to apply, the proponent must first establish a prima facie showing
that a crime or fraud was ongoing or about to be committed. Granada Corp. v. First Court of
Appeals, 844 S.W.2d 223, 227 (Tex. 1992)(orig. proceeding); Volcanic Gardens Management Co.,
Inc. v. Paxson, 847 S.W.2d 343, 347 (Tex.App.--El Paso 1993, orig. proceeding). Whether the
proponent has established a prima facie showing is a matter for the court to decide. Volcanic
Gardens, 847 S.W.2d at 347. The evidence must set forth sufficient proof to support a finding; mere
allegations are insufficient. In re Monsanto Co., 998 S.W.2d 917, 934 (Tex.App.--Waco 1999, orig.
proceeding); Cigna Corp. v. Spears, 838 S.W.2d 561, 569 (Tex.App.--San Antonio 1992, orig.
proceeding). Because the State attempts to show that Martinez was responsible for leaking the
confidential information to the media and sought Osburn's assistance in doing so, it bears the burden
of establishing that the crime-fraud exception applies.

 Martinez has not been charged with releasing confidential information to the media, nor have
we found evidence tending to prove that either Osburn or Martinez was the source of the leak. The
State contends that Martinez admitted to Osburn that he had leaked confidential information and
sought her help with further leaks of confidential information. The record reveals only that Martinez
discussed with the press a description of administrative procedures, his opinion that Borunda's
investigation of Leon was less than thorough, that his contacts with the press had been positive in
nature, and that if Osburn chose to discuss her opinions of Borunda's investigation--which was the
subject of an open records request--Martinez could put her in touch with a reporter who would
protect her anonymity. Nothing in the record suggests that this information was confidential or that
Martinez had committed or was about to commit a crime. Because a mere allegation is insufficient,
the State has yet to establish a prima facie case. We conclude that the exception does not apply so
as to pierce the privilege. We overrule the State's sole issue for review and affirm the judgment of
the trial court.


August 28, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 1

Larsen, McClure, and Chew, JJ.


(Publish)

1. By virtue of State v. Roberts, 940 S.W.2d 655 (Tex.Crim.App. 1996), the State could not appeal from an
order excluding evidence pursuant to Rule 503. We applied Roberts in State v. Medrano, 987 S.W.2d 600, 602
(Tex.App.--El Paso 1999), vacated by 67 S.W.3d 892 (Tex.Crim.App. 2002), on remand 86 S.W.3d 369 (Tex.App.--El Paso 2002, pet. granted) in which we concluded that a motion to suppress evidence is a term of art contemplating more
than simple exclusion pursuant to general rules of evidence such that the statute does not allow interlocutory review of
general pretrial evidentiary rulings. The Court of Criminal Appeals granted review in Medrano, and reconsidered and
overruled its decision in Roberts. State v. Medrano, 67 S.W.3d 892 (Tex.Crim.App. 2002). In the wake of Medrano,
the court likewise reversed and remanded this case for consideration on the merits.
2. Testimony revealed the following hierarchy within the police department: lieutenant, captain/commander
(who perform different jobs but hold the same rank), deputy chief, assistant chief, chief of police.
3. Wiles ultimately replaced DeAngelis as Assistant Chief after DeAngelis was placed on administrative leave.
4. Norman described the report as "a very sensitive document that belonged to the police department." He
characterized it as "special. . . . This case is and continues to be very special."
5. The sealed portion of the record reveals the reason for her reassignment but we will not divulge it here.

 
6. Borunda acknowledged that the media had publicly questioned the integrity and quality of her report. 
7. By all accounts, less than ten percent of the luncheon tape is audible.
8. 962 S.W.2d 544 (Tex.Crim.App. 1997).
9. The record does not indicate whether any disciplinary proceedings were initiated against Osburn and we make
no independent judgment of her conduct.
10. Osburn acknowledged telling Fred Haiman on more than one occasion not to talk with Martinez because
Martinez was her client. Haiman is the local counsel for the Combined Law Enforcement Association of Texas
(CLEAT). In common practice, CLEAT represented department employees in arbitration proceedings and the City
Attorney's Office represented the City.