**Joseph H. SUTTON, Appellant,**

v.

**Estate of A.F. McCORMICK, Deceased and Frances Ann McCormick, Independent Executrix of the Estate of A.F. McCormick, Appellees.**

No. 13–99–623–CV.

Court of Appeals of Texas,
Corpus Christi.

May 10, 2001.

10. *Id.*

11. *Id.*

12. *Id.* at ——, 2001 WL 356290 at *2.

Edward Watt, Robert E. Scott, Austin, for Appellant.

Rudy Xavier Rodriguez, Law Offices of Rudy Rodriguez, Harlingen, Thomas F. Nye, Linda C. Breck, Brin & Brin, Corpus Christi, for Appellee.

Before Justices DORSEY, RODRIGUEZ, and SEERDEN [1].

## OPINION

DORSEY, Justice.

This is an appeal of a take-nothing judgment entered after a jury verdict in a legal malpractice case. Joseph Sutton sued attorney A.F. McCormick for legal malpractice, claiming that McCormick was negligent in preparing certain legal documents related to a transaction between Sutton and Texas Ostrich Company. Sutton claims that the loan documents prepared by McCormick contained a usurious rate of interest, and as a result, Sutton was sued on the note and ultimately lost money. Attorney McCormick died while the suit

---

1. Senior Justice Robert J. Seerden assigned to this court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1998).

was pending, and his estate was substituted for him as a party.[2]

We hold that the issues in this case were properly submitted to the jury and that sufficient evidence supports its verdict. Accordingly, we AFFIRM the judgment of the trial court.

▓▓▓▓ The first question submitted to the jury stated:

At the time in question, was Joseph Sutton a client of A.F. McCormick with respect to the matter in dispute?

By his first eight points of error, Sutton argues that there was no evidence, or factually insufficient evidence, to justify submission of this question. During oral argument, Sutton conceded that if that issue was properly submitted to the jury, all his other points of error must necessarily fail. We hold that the evidence was sufficient to submit the question to the jury and that the jury's answer that such a relationship did not exist was not against the great weight and preponderance of the evidence.[3]

▓▓▓▓ Sutton, as plaintiff, had the burden to prove the existence of an attorney-client relationship between himself and Attorney McCormick. *Yaklin v. Glusing, Sharpe & Krueger*, 875 S.W.2d 380, 383 (Tex.App.—

Corpus Christi 1994, no writ). "An attorney-client relationship must exist before an attorney is obligated to provide proper legal services." *Moore v. Yarbrough, Jameson & Gray*, 993 S.W.2d 760, 763 (Tex.App.—Amarillo 1999, no pet.). This Court has explained:

> In order to establish liability [for legal malpractice], a claimant must establish a duty, a breach of that duty, and damages that result from the breach. The duty implicated is that which an attorney owes a client, and before any duty arises there must first be an attorney-client relationship.
>
> . . .
>
> Once the attorney-client relationship is established, numerous duties are owed the client by the lawyer, which, among others, are to use utmost good faith in dealings with the client, to maintain the confidences of the client, and to use reasonable care in rendering professional services to the client. The duties flow from the relationship . . . .

*Yaklin*, 875 S.W.2d at 383; *accord Stephenson v. LeBoeuf*, 16 S.W.3d 829, 836 (Tex.App.—Houston [14th Dist.] 2000, no pet.); *Moore*, 993 S.W.2d at 763; *Honeycutt v. Billingsley*, 992 S.W.2d 570, 581

---

**2.** All references to "McCormick" denote his estate where appropriate.

**3.** Because all eight of Sutton's first points of error hinge on the question of whether the evidence was sufficient to support the jury's finding that no attorney-client relationship existed, Sutton must meet the standards for legal and factual sufficiency that would require the trial court to either direct a verdict on that issue or throw out the jury's finding on it. When reviewing for legal sufficiency, we must determine whether any evidence supports the challenged finding. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If so, it must be upheld. *Id.* We consider only the evidence and reasonable inferences that support the verdict and disre-

gard all evidence and inferences to the contrary. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 521 (Tex.1997); *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex.1994). When reviewing for factual sufficiency, we must determine whether the challenged finding is against the great weight and preponderance of the evidence, considering and weighing all of the evidence, not just that evidence that supports the verdict. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998). In reviewing the factual sufficiency, we can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* at 407.

(Tex.App.—Houston [1st Dist.] 1999, pet. denied).

■■■ The attorney-client relationship is a contractual relationship whereby an attorney agrees to render professional services for a client. *Mellon Service Co. v. Touche Ross & Co.,* 17 S.W.3d 432, 437 (Tex.App.—Houston [1st Dist.] 2000, no pet.). The relationship may be expressly created by contract, or it may be implied from the actions of the parties. *Id.; see also Burnap v. Linnartz,* 914 S.W.2d 142, 148–49 (Tex.App.—San Antonio 1995, writ denied) (explaining the requirement that a client be in privity of contract with an attorney in order to have a cause of action for malpractice). For the relationship to be established, "the parties must explicitly or by their conduct manifest an intention to create it. To determine whether there was a meeting of the minds, we use an objective standard examining what the parties said and did and do not look at their subjective states of mind." *Roberts v. Healey,* 991 S.W.2d 873, 880 (Tex.App.—Houston [14th Dist.] 1999, pet. denied).

■■■ Because the evidence did not conclusively establish that an attorney-client relationship existed between Sutton and McCormick that would impose the duty to inquire into the substance of the contract rather than to serve as a mere scrivener between two parties, we hold that the question was properly submitted to the jury. Likewise, we hold the jury's answer to the question was not against the great weight and preponderance of the evidence.

Mr. Sutton testified at trial that he was living in Maine and attempting to relocate to the South Texas area when he first came in contact with attorney McCormick. Sutton's attorney in Maine gave him McCormick's name out of a legal directory as someone to use in purchasing a ranch down in South Texas. Mr. Sutton hired McCormick to represent him in purchasing a ranch. .

Before closing on the ranch, Mr. Sutton came in contact with an ostrich rancher, Mr. Mantzel. Sutton learned that Mantzel was having some financial trouble, and might be interested in talking to him about how they could work out an arrangement that would solve Mantzel's financial problems and would enable Sutton to break into the ostrich-farming business. Mantzel flew to Maine, and within a twenty-four hour period, Sutton and Mantzel had negotiated a deal.

While Mantzel was in Maine visiting and negotiating the deal with Sutton, they called attorney McCormick in Raymondville to draw up the paperwork. Sutton testified:

> Well, I told [Mantzel], first of all, we would have to have an attorney. I said, "I have mine. I have somebody in mind in Raymondville." And I said—One of the stipulations was that he or his company [was] to pay for ... all of my attorney's fees to McCormick....

He then called Attorney McCormick at his office in Texas:

> ... because I wanted Mr. McCormick to start drawing up the contracts as we had agreed to them in my living room, and I wanted him to have all of the information available, so that when he got down there the following day ... everything would be ready to sign.

The testimony regarding what was said during that phone call was vague. Sutton testified that he put Mantzel on the phone to dictate the terms of their agreement to McCormick's secretary. He then testified as follows:

> Q. Mr. Sutton what you had been testifying to about right at the time of the break, what was it that you discussed with Mr. McCormick in the telephone

call that you made from your house in Maine to him in Raymondville? Could you continue with that?

A. Well, I just wanted to make sure that he would be available to create a document to protect both Mr. Mantzel and myself; primarily me, though, because he did represent me. And I wanted to be sure that he understood the contents of our agreement that we had just finished making over the telephone. This seemed to be very urgent to Mr. Mantzel. Time was running out on who he had to pay this money to, and I wanted to help in that situation, not to mention the fact that I was benefitting financially as well. And I also wanted to make sure that he understood that Mr. Mantzel was going to be responsible for this. Obviously—

Q. "For this." Do you mean the attorney's fees?

A. Yes. Obviously, when I used to go to a bank to make a loan, I used to pay ... the attorney's fees that the bank incurred, and in this case [Mantzel] was going to pay my attorney's fees that I incurred. And it made sense and he did.

Q. What else was in the telephone conversation, if anything, with Mr. McCormick?

A. Mr. McCormick told me he better put his secretary on because she would be typing up in draft the agreement, and so it would be easier for her to understand it, and then she could give it to him to review.

Q. And did y'all then proceed to tell her the details of the transaction?

A. Yes, we did.

Q. What then happened?

A. We flew back and signed the deal.

Q. Did Mr. Mantzel pay for your flight?

A. Yes, he did.

Q. Did you go to Mr. McCormick's office when you got to Raymondville?

A. Yes, we did.

Q. Is that where the documents were signed?

A. Yes.

Sutton later testified:

> I wanted [McCormick] to be aware that he is drawing this contract up for both parties. Even though he is representing me, he is also wanting to protect, you know, the other party as far as the agreements that I made to the other party in terms of what I was going to perform.... He told me he understood what I meant, and he would most definitely protect me.

As McCormick was deceased at the time of the trial, he was obviously unable to give testimony regarding his understanding of the agreement between himself and Mr. Sutton. His estate offered testimony that McCormick's fee was paid by Texas Ostrich Company, not by Mr. Sutton. We find that the jury was within its province in deciding the question of whether an attorney-client relationship existed between Sutton and McCormick with regard to the agreement between Sutton and Texas Ostrich.

▬▬▬ The trial court must submit the questions, instructions and definitions that are raised by the written pleadings and the evidence. TEX. R. CIV. P. 278; *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 862 (Tex.1999). In fact,

> A trial court may refuse to submit a question only if no evidence exists to warrant its submission. If there is some evidence to support a jury question and the trial court does not submit the question, the trial court has committed reversible error. In determining whether a trial court should have submitted a

question to the jury, the reviewing court must examine the record for evidence supporting submission of the question and ignore all evidence to the contrary. Conflicting evidence presents a fact question for the jury.

*Id.* (internal citations omitted).

 In filing suit against McCormick, Sutton assumed the burden to establish by a preponderance of the evidence that he had an attorney-client relationship with McCormick. *See Yaklin*, 875 S.W.2d at 383. If he offered no evidence to establish this relationship, his claim would fail as a matter of law. The only evidence he did offer on this issue was his own testimony. However, he was only capable of testifying about matters within his personal knowledge. Therefore, he could not possibly have testified regarding Attorney McCormick's understanding of the relationship between them, except indirectly by testifying about the circumstances surrounding the transaction. Also, the jury was free to believe or disbelieve any or all of his testimony.

Sutton's testimony left unclear the exact parameters of the relationship between himself and Attorney McCormick. Even assuming that Sutton's testimony is true, the jury could have believed that Attorney McCormick was acting as a mere scrivener between the two parties, or that he was—to a limited extent—representing them both. *Cf. Pondrum v. Gray*, 298 S.W. 409, 412 (Tex.Com.App.1927) (adopting the rule that when an attorney is acting as a mere scrivener, communications between himself and the party are not confidential);[4] TEX. DISCIPLINARY R. PROF'L CONDUCT 1.07, *reprinted in* TEX. GOVT. CODE ANN., Tit. 2, Subtit. G App. A, (Vernon 1998) (TEX. STATE BAR R. art. X, § 9) (outlining the conditions under which "common representation" of more than one client is permissible). In either event, McCormick would not have been obligated to investigate le-

4. The court explained:

> An attorney is often employed for some other purpose than to conduct litigation, to give advice on legal questions, or to engage in some other activity peculiarly within the province of an attorney at law as distinguished from a person engaged in some other pursuit. In such a case the relation of attorney and client in the strict sense of those terms cannot be said to exist between the attorney and the one who has engaged his services. Accordingly communications made during the course of that employment are not regarded by the courts as between attorney and client and are not accorded protection from disclosure. This rule has been applied in the case of an attorney acting as an agent for another, as an attorney in fact, or as a notary public. So where an attorney is employed merely to put in legal form and phrase certain documents or agreements of the parties, the fact that he is skilled in the law will not make him incompetent as a witness, nor can the communications made by the parties to him be considered as privileged. A conveyancer is not

> a legal adviser or a professional adviser in any proper sense of those terms and a communication made to a conveyancer is not privileged. This rule has been applied to the drawing of deeds, mortgages and agreements. And where an attorney is requested by a debtor to draw up a mortgage deed of his personal property, and the debtor discloses his purposes in making such a conveyance, either without any particular motive or in order to remove any scruple the attorney may have as to the character of the transaction, but no legal advice is asked or given, the testimony of the attorney as to such communications is admissible.

> *Pondrum*, 298 S.W. at 412. *See also In re Texas Farmers Ins. Exchange*, 990 S.W.2d 337, 340 (Tex.App.—Texarkana 1999) (orig. proceeding), *mand. denied*, 12 S.W.3d 807 (Tex.2000) ("[T]he [communications] privilege does not apply if the attorney is acting in a capacity other than that of an attorney."); *Burnap v. Linnartz*, 914 S.W.2d at 148–49 (holding that fact question existed regarding whether attorney-client relationship was formed or whether attorney was acting as mere scrivener in a particular transaction).

gal issues raised by the substantive terms of the agreement. While we find the evidence that Texas Ostrich paid for McCormick's services in drafting the agreement is of limited probative value, it is some evidence from which the jury was free to draw reasonable inferences. *But cf. SMWNPF Holdings, Inc. v. Devore,* 165 F.3d 360, 366–67 (5th Cir.1999) (affirming grant of summary judgment in favor of attorney in suit brought against attorney by nonclient, holding that evidence that nonclient paid fees, as is customary in sophisticated commercial transactions such as this, amounted to no evidence that attorney-client relationship was formed). One such inferences is that McCormick was providing limited representation to both parties, and did not owe to Sutton the preeminent duties incumbent with a traditional attorney-client relationship.

Because our resolution of this point renders moot an analysis of appellant's other points, we do not address them. Accordingly, we affirm the trial court's judgment in all respects.