**The STATE of Texas, Appellant,**

v.

**Cerjio MARTINEZ, Appellee.**

**No. 08–01–00212–CR.**

Court of Appeals of Texas,
El Paso.

Aug. 28, 2003.

Jaime E. Esparza, Dist. Atty., El Paso, for Appellant.

John P. Mobbs, Attorney At Law, El Paso, for Appellee.

Before Panel No. 1 LARSEN, ANN CRAWFORD McCLURE, and CHEW, JJ.

## *OPINION*

ANN CRAWFORD McCLURE, Justice.

In this case of wide public interest bearing overtones of scandal and political intrigue, we consider whether conversations between a deputy police chief of the El Paso Police Department and an Assistant City Attorney are protected by the attorney-client privilege. Confidential information was leaked to the local newspaper and a television station concerning an ongoing investigation into administrative issues within the police department. Deputy Chief Cerjio Martinez and Assistant Chief George DeAngelis were considered possible suspects. A criminal investigation into the leak itself focused on misuse of official information proscribed by Section 39.06 of the Texas Penal Code. Neither Martinez nor DeAngelis was indicted for that offense. Instead, they were indicted for aggravated perjury based on inconsistencies between sworn statements to the grand jury and surreptitiously tape-recorded conversations with El Paso Assistant City Attorney, Stephanie Osburn. After indictment, Martinez filed a motion to suppress all evidence obtained from Osburn based upon attorney-client privilege. Following evidentiary hearings, the trial court suppressed all of Martinez's statements to and conversations with Osburn.

The State has filed several interlocutory appellate proceedings arising from the prosecution of Martinez. By separate order, the trial court suppressed Martinez's statement to the grand jury. We original-

ly affirmed, but the Court of Criminal Appeals affirmed in part and reversed in part. *State v. Martinez*, 92 S.W.3d 10 (Tex.App.-El Paso 2001), *aff'd in part, rev'd in part*, 91 S.W.3d 331 (Tex.Crim. App.2002). The case is now pending before us on remand on the issue of whether Martinez's statement was voluntary and it will be addressed by separate opinion. The State also sought mandamus relief, contending that the trial court lacked jurisdiction to render the order appealed from here because of the pendency of its first interlocutory appeal involving the grand jury statement. We denied relief. *In re The State of Texas*, 50 S.W.3d 100 (Tex.App.-El Paso 2001, orig. proceeding). This appeal was previously dismissed for want of jurisdiction based upon then-existent precedent.[1] The Court of Criminal Appeals reversed and remanded for consideration on the merits. *State v. Martinez*, 53 S.W.3d 903 (Tex.App.-El Paso 2001), *rev'd*, 70 S.W.3d 894 (Tex.Crim. App.2002). We now undertake that task. We have endeavored to offer a complete factual summary but large portions of the record were sealed by the trial court, including grand jury testimony. We have reviewed all documents under seal but will avoid direct reference to them.

## FACTUAL SUMMARY

Cerjio Martinez has been an officer with the El Paso Police Department for over twenty years. In January 2000, he was promoted to deputy chief. In his new position, he supervised over 200 officers assigned to Central Command, including five commanders and four captains. George DeAngelis was an assistant chief in the El Paso Police Department.[2] He has also been indicted for perjury; his case proceeds separately and is presently before us in *State v. DeAngelis*, 08-01-00205-CR, 116 S.W.3d 396, 2003 WL 22023563 (Tex.App.—El Paso 2001).

Stephanie Osburn began employment as an Assistant City Attorney in April 1999. She described her job as representing the City of El Paso on department disciplinary matters, criminal subpoenas, and expungements. She was assigned to Internal Affairs at the police department and maintained an office there as well as at City Hall. Police officers were agents of the City who fell within the representation umbrella. Osburn dispensed legal advice to the upper echelons of the police department—captains and above. As was common practice within the City Attorney's Office, Assistant City Attorneys routinely addressed documents to individual police officers bearing a label that the communications were privileged. Osburn thought she had major input into the decisions made by the police leadership and hoped they would act on her advice.

---

1. By virtue of *State v. Roberts*, 940 S.W.2d 655 (Tex.Crim.App.1996), the State could not appeal from an order excluding evidence pursuant to Rule 503. We applied *Roberts* in *State v. Medrano*, 987 S.W.2d 600, 602 (Tex. App.-El Paso 1999), *vacated by* 67 S.W.3d 892 (Tex.Crim.App.2002), *on remand* 86 S.W.3d 369 (Tex.App.-El Paso 2002, pet. granted) in which we concluded that a motion to suppress evidence is a term of art contemplating more than simple exclusion pursuant to general rules of evidence such that the statute does not allow interlocutory review of general pretrial evidentiary rulings. The Court of

Criminal Appeals granted review in *Medrano*, and reconsidered and overruled its decision in *Roberts*. *State v. Medrano*, 67 S.W.3d 892 (Tex.Crim.App.2002). In the wake of *Medrano*, the court likewise reversed and remanded this case for consideration on the merits.

2. Testimony revealed the following hierarchy within the police department: lieutenant, captain/commander (who perform different jobs but hold the same rank), deputy chief, assistant chief, chief of police.

In January 2000, DeAngelis showed Osburn a memo he had written to Chief of Police Carlos Leon on August 31, 1999. In the memo, he formally requested that Chief Leon remove Officer Luis Cortinas from his position as Leon's administrative assistant due to his involvement in activities which could bring discredit to the department. DeAngelis acknowledged that he had met with the FBI before writing the letter and his suspicions about Cortinas had been confirmed. By January, DeAngelis was concerned about the status of the investigation and discussed the issue with Osburn. Osburn began communicating with DeAngelis on a daily basis. DeAngelis often criticized Chief Leon in his conversations with Osburn. After Martinez was promoted to deputy chief in January 2000, he also began dealing with Osburn on a frequent basis. Osburn testified that she was "dealing with Chief Martinez as a lawyer and on legal matters involving the El Paso Police Department." While the record is silent on the details, it does reveal that Osburn was also engaged in a personal relationship with Martinez from January until April 2000. They spoke daily, discussed "all kinds of issues" and more than just City business. Like DeAngelis, Martinez had no hesitation about criticizing Chief Leon in his conversations with her.

In April 2000, DeAngelis lodged a formal complaint with the City concerning the administrative issues raised in his August 1999 memo as well as other serious allegations of misconduct by Chief Leon. Assistant City Attorney Chris Borunda began an investigation and Chief Leon and

DeAngelis were placed on paid administrative leave by the mayor. Borunda submitted her report to the mayor, who publicly reprimanded Chief Leon on June 26, 2000. Osburn, DeAngelis, and Martinez criticized the accuracy and credibility of Borunda's investigation. DeAngelis thought that little action had been taken against Chief Leon and he was frustrated with the results, which he termed a "whitewash."

The very next day, an El Paso television station reported that it had received a sixteen-page confidential report relating to a criminal investigation of Officer Cortinas. The report was purportedly leaked by an anonymous source within the El Paso Police Department. The *El Paso Times* printed the story on June 28, 2000. On the same day, it submitted an open records request about other allegations of misconduct. Assistant Police Chief Richard Wiles initiated a separate investigation into the leak.[3] Wiles assigned Lieutenant David Norman to the investigation.[4] While the investigation was pending, Osburn was relieved of her duties with the El Paso Police Department.[5] Although she told DeAngelis, she did not notify Martinez of her reassignment.

In July, Martinez went to see Osburn at her office to discuss what he perceived to be retaliatory actions toward him by Chief Leon as a result of his participation in Borunda's investigation. Osburn escorted Martinez to Borunda's office and sat with him while he filed a formal complaint. When Martinez asked Borunda for legal advice, she told him that she could never give City employees individual legal advice. He then expressed his concerns to

---

**3.** Wiles ultimately replaced DeAngelis as Assistant Chief after DeAngelis was placed on administrative leave.

**4.** Norman described the report as "a very sensitive document that belonged to the police department." He characterized it as "spe-

cial.... This case is and continues to be very special."

**5.** The sealed portion of the record reveals the reason for her reassignment but we will not divulge it here.

Osburn and wanted to know what he needed to do. Osburn advised him to document any retaliatory actions and suggested that he classify any statements as "whistle blower" information. On July 6 or 7, Martinez called Osburn and asked if she would be willing to talk to the media about the flaws in Borunda's investigation. She declined and reported the request to Detective George Althoff.

On August 2, Norman confronted Osburn and accused her of misusing official information. He threatened her with criminal prosecution and the loss of her job and law license. When Osburn asked what he wanted her to do, Norman presented her with an immunity agreement prepared in advance and urged her cooperation in tape recording a conversation with Martinez. Osburn did not discuss these events with anyone else in the City Attorney's office before agreeing to participate. The call was placed from City Hall and Norman orchestrated the conversation. Martinez was not aware that the conversation was being recorded. Osburn began by telling Martinez that she was working late, to lead him to believe that the purpose of the call was not social. She then told him that the City had just received an open records request from one of the television stations. The conversation turned to contact with the media concerning Borunda's investigation and Osburn's criticism of that investigation. Osburn inquired whether Martinez still wanted her to speak with a reporter. Martinez advised her that she shouldn't talk to the media unless she was willing to do so and certain that her name would not be revealed. Martinez explained that the only details he had provided to the media were general descriptions of administrative procedure, his opinion

that Borunda's investigation was less than thorough,[6] and his comment to a reporter that Osburn might be willing to talk if she remained anonymous. Osburn also took the opportunity to discuss with Martinez his employment issues, and asked whether Chief Leon was still "bothering" him. Martinez told her that Leon was scrutinizing his work and would not interact with him at all. At the end of the telephone conversation, Osburn asked to meet with Martinez and he suggested that they have lunch the next day. Norman placed a wire in Osburn's purse in order to record the luncheon conversation.[7] Later that afternoon, Norman and Buster Collins, a Texas Ranger, visited Martinez at police headquarters. Norman transcribed his notes from the interview into a statement entitled "sworn statement to the grand jury." He took it to Martinez's home a few days later so that Martinez could review and edit the statement. The corrected statement was duly signed and notarized.

Based on alleged inconsistencies between the taped conversations with Osburn and the "sworn statement to the grand jury," Martinez was indicted for aggravated perjury. On August 18, 2000, his defense counsel—Luis Aguilar—wrote a letter to Osburn in which he advised her that he was now representing Martinez. Osburn replied by letter dated August 22, informing Aguilar "that my client has always been the City of El Paso, not Mr. Martinez." In a second letter dated September 7, she clarified the attorney-client relationship:

> As counsel for the City of El Paso, it is my job to represent various departments in various issues and proceedings. In my position as counsel for the El

6. Borunda acknowledged that the media had publicly questioned the integrity and quality of her report.

7. By all accounts, less than ten percent of the luncheon tape is audible.

Paso Police Department, it fell upon me to provide legal advice to many individual members of the Department. That advice was given to those individuals in their capacity as representatives of the El Paso Police Department, not in their individual capacity.

Therefore, while I have provided legal advice to Cerjio Martinez on several occasions, I gave that advice to him in his capacity as representative of the Department. I reiterate that at all times, my client has been the City of El Paso, not Cerjio Martinez.

At the hearings on the motion to suppress, Assistant City Attorney Elaine Hengen testified that her only client was the City of El Paso. She opined that there was no privilege with respect to any of the statements on the tape recordings and that she had been authorized by City Attorney Charles McNabb to not assert any privilege as to the contents. In her view, the privilege only applied to police department employees if the employees were acting within their authority to seek legal services or were given authority to act on legal advice. City Attorneys were not allowed to represent employees in their individual capacities for matters outside of City business. Hengen did not believe that the taped conversations presented any evidence of a crime or fraud.

Chief Leon and Assistant Chief Wiles both testified that they had sought advice from Osburn when it involved official police business. Osburn's area of expertise was arbitrating employee disciplinary actions. She participated in regular disciplinary review meetings in order to assess uniform discipline throughout the regional commands. Confidential information was often revealed to the City Attorney's office relating to investigations of police officers.

Chief Leon expected that any discussion that he had with the City Attorneys which was legal in nature would be confidential.

Osburn testified that it was her duty to provide legal advice to many individual members of the police department. She acknowledged writing the letters in which she claimed to represent the City, and not Martinez and DeAngelis as individuals, although she had never told them that. At the time of the hearing, however, her perception was "that I do have an understanding of how Mr. Martinez and Mr. DeAngelis could assume that there was a privilege existing and that based on that assertion, I have to assume that the comments they made to me they felt were in confidence."

The trial court suppressed the communications between Martinez and Osburn as well as the fruits therefrom on the basis of the attorney-client privilege. The State now appeals.

## STANDARD OF REVIEW

██ The litigants disagree over the appropriate standard of review. The State argues that although the issue is not entirely settled, we are to review *de novo* the applicability of the attorney-client privilege and the exclusion of evidence resulting from a violation of the privilege. Martinez contends that we should review an interlocutory appeal from a pre-trial order excluding evidence for an abuse of discretion. Looking to the Court of Criminal Appeals for direction, we believe *de novo* review to be appropriate. In *Henderson v. State,*[8] the court began by noting that at least one federal circuit holds that "mixed questions of law and fact, regarding the applicability of the attorney-client privilege to particular communications" must be reviewed *de novo. Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1413 (11th Cir.),

8. 962 S.W.2d 544 (Tex.Crim.App.1997).

*opinion modified on other grounds,* 30 F.3d 1347 (1994), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). It also recognized its own precedent in applying *de novo* review to mixed questions of law and fact. *Villarreal v. State,* 935 S.W.2d 134, 138 n. 5 (Tex.Crim.App.1996)(plurality opinion); *id.* at 139–41 (McCormick, J. concurring); *id.* at 141–45 (Clinton, J. concurring); *id.* at 145–50 (Keller, J. concurring). With regard to motions to suppress, however, we review a trial court's ruling for an abuse of discretion. *Villarreal,* 935 S.W.2d at 138; *Brewer v. State,* 932 S.W.2d 161, 166 (Tex. App.-El Paso 1996, no pet.). The trial judge is the sole and exclusive trier of facts at a suppression hearing. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App. 1990); *Brewer,* 932 S.W.2d at 166. Therefore, an appellate court must defer to a trial court's determination of historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *Gordon v. State,* 4 S.W.3d 32, 35 (Tex.App.-El Paso 1999, no pet.). Accordingly, we will defer to the trial court's determination of historical facts, but review *de novo* the application of law to those facts.

### ATTORNEY–CLIENT PRIVILEGE

■ Martinez contends that his conversations with Osburn, including the tape recordings, are protected by attorney-client privilege. Invocation of the privilege is dependent upon the existence of an attorney-client relationship, which has been defined as a contractual relationship whereby an attorney agrees to render professional services for a client. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld,* 105 S.W.3d 244, 254 (Tex.App.-Houston [14th Dist.] 2003, pet. filed), *citing Mellon Serv. Co. v. Touche Ross & Co.,* 17 S.W.3d

432, 437 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

### *Formation of the Attorney–Client Relationship*

■ The relationship may be expressly created by contract, or it may be implied from the actions of the parties. *Tanox,* 105 S.W.3d at 254, *citing Sutton v. Estate of McCormick,* 47 S.W.3d 179, 182 (Tex. App.-Corpus Christi 2001, no pet.); *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 405 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.). The determination of whether there is a meeting of the minds must be based on objective standards of what the parties did and said and not on their alleged subjective states of mind. *Terrell v. State,* 891 S.W.2d 307, 313 (Tex. App.-El Paso 1994, pet. ref'd). A question of fact exists when the evidence does not conclusively establish the existence of an attorney-client relationship. *Tanox,* 105 S.W.3d at 254; *Sutton,* 47 S.W.3d at 182; *Kanow v. Brownshadel,* 691 S.W.2d 804, 805–06 (Tex.App.-Houston [1st Dist.] 1985, no writ).

### *Scope of the Privilege*

■ The scope of the attorney-client privilege is defined by the rules of evidence. TEX.R.EVID. 503. The privilege is intended to allow unrestrained communication and contact between the attorney and client in all matters in which the attorney's professional advice or services are sought, without fear that these confidential communications will be disclosed by the attorney, voluntarily or involuntarily, in any legal proceeding. *Huie v. DeShazo,* 922 S.W.2d 920, 922 (Tex.1996); *In re Toyota Motor Corp.,* 94 S.W.3d 819, 822 (Tex. App.-San Antonio 2002, pet. denied). Rule 503 protects confidential communications "made for the purpose of facilitating the rendition of professional legal services to

the client." Tex.R.Evid. 503(b)(1); *Huie*, 922 S.W.2d at 922; *In re ExxonMobil Corp.*, 97 S.W.3d 353, 357 (Tex.App.-Houston [14th Dist.] 2003, no pet.). The privilege applies not only to legal advice, but attaches to complete communications between an attorney and the client. *In re Carbo Ceramics Inc.*, 81 S.W.3d 369, 374 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *GAF Corp. v. Caldwell*, 839 S.W.2d 149, 151 (Tex.App.-Houston [14th Dist.] 1992, orig. proceeding). The subject matter of the information contained in the communication is irrelevant when determining whether the privilege applies. *See Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 589 (Tex.App.-Dallas 1994, no writ).

 For a communication to be privileged, it must appear that the communication was made by a client seeking legal advice from a lawyer in her capacity as such and the communication must relate to the purpose for which the advice is sought; the proof, express or circumstantial, must indicate the client's desire for confidence and secrecy. *Duval County Ranch Co. v. Alamo Lumber Co.*, 663 S.W.2d 627, 634 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.); *Ballard v. Ballard*, 296 S.W.2d 811, 816 (Tex.Civ.App.-Galveston 1956, no writ). A communication is confidential if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication. Tex.R.Evid. 503(b)(1). The attorney-client privilege confers upon the client the right to prevent disclosure of communications at any stage of the criminal proceedings.

### *Identity of the Client*

Having addressed the formation of the relationship and the nature of confidential communications, we come to the pricklier issue of the role of the government lawyer and the identification of the client. A "client" is:

[A] person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from that lawyer.

Tex.R.Evid. 503(a)(1). A "representative of the client" is (A) a person having authority to obtain professional legal services, or to act on advice thereby rendered, on behalf of the client, or (B) any other person who, for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the scope of employment for the client. Tex.R.Evid. 503(a)(2)(A), (B). The Texas Disciplinary Rules of Professional Conduct also address the issue:

**Rule 1.12. Organization as a Client**

(a) A lawyer employed or retained by an organization represents the entity. While the lawyer in the ordinary course of working relationships may report to, and accept direction from, an entity's duly authorized constituents, in the situations described in paragraph (b) the lawyer shall proceed as reasonably necessary in the best interest of the organization without involving unreasonable risks of disrupting the organization and of revealing information relating to the representation to persons outside the organization.

(b) A lawyer representing an organization must take reasonable remedial actions whenever the lawyer learns or knows that:

(1) an officer, employee, or other person associated with the organization has committed or intends to commit a violation of a legal obligation to the organization or a violation of law

which reasonably might be imputed to the organization;

(2) the violation is likely to result in substantial injury to the organization; and

(3) the violation is related to a matter within the scope of the lawyer's representation of the organization.

. . .

(e) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing or when explanation appears reasonably necessary to avoid misunderstanding on their part.

TEX.DISCIPLINARY R.PROF'L CONDUCT 1.12. Comment 3 advises that when an employee of the entity communicates with the entity's attorney in the employee's organizational capacity, the communication is privileged. But comment 4 cautions that there are times when the entity's interest may become adverse to that of its employee:

**Clarifying the Lawyer's Role**

4. In such circumstances the lawyers should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care should be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the

lawyer for the organization and the individual may not be privileged insofar as that individual is concerned. Whether such a warming [sic] should be given by the lawyer for the organization to any constituent individual may turn on the facts of each case.

While comment 9 acknowledges that "defining precisely the identity of the client and prescribing the resulting obligations of such lawyers may be more difficult in the government context," it suggests a different balance may be appropriate between maintaining confidentiality and assuring that a wrongful official act is prevented inasmuch as public business is involved. TEX.DISCIPLINARY R.PROF'L CONDUCT 1.12 cmt. 9. Hengen and Borunda clearly understood this requirement. We cannot say the same for Osburn.[9]

██ Osburn initiated communications with Martinez in her capacity as an Assistant City Attorney when she was first notified of the allegations made against Chief Leon. She began speaking with him daily, first as an attorney and then as a friend. Throughout that time, Martinez sought her advice on internal issues within the police department and on his own employment issues, including potential "whistle blower" claims. They shared with one another their criticisms of Chief Leon and his management of the police department. They vented their frustrations with what they perceived as Borunda's hasty and less than thorough investigation. Although Osburn was ultimately relieved of her assignment to the El Paso Police Department, she never relayed that information to Martinez. Nor did she ever explain to him that she could not provide him with personal legal advice. Instead, she referred to Martinez on several occasions as "her

9. The record does not indicate whether any disciplinary proceedings were initiated against Osburn and we make no independent judgment of her conduct.

client." [10] In the aftermath of the immunity agreement which required Osburn to fully cooperate and testify for the prosecution, Osburn told the grand jury that Martinez was never her client. But by the time of the suppression hearing, she had had second thoughts. Ultimately, she admitted Martinez could well have believed that the attorney-client privilege protected comments made to her in confidence. And significantly, Hengen testified that if a City Attorney engaged in individual representation in violation of City policy, the attorney-client privilege would protect their communications. In other words, a violation of City policy prohibiting individual representation would not defeat the privilege.

According the appropriate deference to the trial court's determination of these historical facts and its unique ability to observe the credibility, demeanor and sincerity of the witnesses, we find ourselves unable to fault Judge Medrano's conclusion that Martinez's conversations with Osburn and any fruits stemming therefrom were protected by attorney-client privilege.

### CRIME–FRAUD EXCEPTION

 The State next contends that Martinez sought Osburn's assistance in releasing confidential information to the media thus implicating the crime-fraud exception to the attorney-client privilege:

(d) **Exceptions.** There is no privilege under this rule:

(1) *Furtherance of crime or fraud.* If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud.

Tex.R.Evid. 503(d)(1). The plain language of the rule indicates that a continuing or future crime is not enough; the attorney's services must be sought to aid in the commission of the crime. *Henderson,* 962 S.W.2d at 553. The lawyer's knowledge of the client's purpose may enable the lawyer to prevent the commission of the prospective crime. When the threatened injury is grave, the lawyer's interest in preventing the harm may be more compelling than the interest in preserving the confidentiality of information. *Id.* at 554–55.

 In order for the exception to apply, the proponent must first establish a *prima facie* showing that a crime or fraud was ongoing or about to be committed. *Granada Corp. v. First Court of Appeals,* 844 S.W.2d 223, 227 (Tex.1992)(orig.proceeding); *Volcanic Gardens Management Co., Inc. v. Paxson,* 847 S.W.2d 343, 347 (Tex.App.-El Paso 1993, orig. proceeding). Whether the proponent has established a *prima facie* showing is a matter for the court to decide. *Volcanic Gardens,* 847 S.W.2d at 347. The evidence must set forth sufficient proof to support a finding; mere allegations are insufficient. *In re Monsanto Co.,* 998 S.W.2d 917, 934 (Tex. App.-Waco 1999, orig. proceeding); *Cigna Corp. v. Spears,* 838 S.W.2d 561, 569 (Tex. App.-San Antonio 1992, orig. proceeding). Because the State attempts to show that Martinez was responsible for leaking the confidential information to the media and sought Osburn's assistance in doing so, it bears the burden of establishing that the crime-fraud exception applies.

---

**10.** Osburn acknowledged telling Fred Haiman on more than one occasion not to talk with Martinez because Martinez was her client. Haiman is the local counsel for the Combined Law Enforcement Association of Texas (CLEAT). In common practice, CLEAT represented department employees in arbitration proceedings and the City Attorney's Office represented the City.

Martinez has not been charged with releasing confidential information to the media, nor have we found evidence tending to prove that either Osburn or Martinez was the source of the leak. The State contends that Martinez admitted to Osburn that he had leaked confidential information and sought her help with further leaks of confidential information. The record reveals only that Martinez discussed with the press a description of administrative procedures, his opinion that Borunda's investigation of Leon was less than thorough, that his contacts with the press had been positive in nature, and that if Osburn chose to discuss her opinions of Borunda's investigation—which was the subject of an open records request—Martinez could put her in touch with a reporter who would protect her anonymity. Nothing in the record suggests that this information was confidential or that Martinez had committed or was about to commit a crime. Because a mere allegation is insufficient, the State has yet to establish a *prima facie* case. We conclude that the exception does not apply so as to pierce the privilege. We overrule the State's sole issue for review and affirm the judgment of the trial court.