NUMBER 13-05-667-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


LESTER EUGENE VOLRIE

AKA LESTER VOLRIE, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 252nd District Court of Jefferson County, Texas.


 


MEMORANDUM OPINION



Before Justices Yañez, Rodriguez, and Garza


Memorandum Opinion by Justice Yañez


 

 A jury found appellant, Lester Eugene Volrie, guilty of murder, (1) found the
enhancement allegations "true," and assessed punishment at life imprisonment. In four
issues, appellant contends the trial court erred in: (1) admitting the testimony of Randy
Graffagnino, a witness for the State; (2) limiting the cross-examination of Geraldine Breaux,
another State witness; (3) limiting the cross-examination of Atlas Gordon, a witness for the
State during the punishment phase of trial; (4) and allowing improper argument by the
State during the punishment phase. We affirm.

 I. Background


 On June 24, 2004, Joyce Volrie, appellant's estranged wife (the deceased), went
to a high school reunion with her sister, Geraldine Breaux. Appellant knew that the two
planned to attend the reunion and arranged to meet them there. Breaux testified that soon
after they arrived at the reunion, Joyce left with appellant in his blue Explorer because he
"wanted to talk to her." Later, Breaux called Joyce on her cell phone; Joyce said she was
"all right" and that appellant was going to bring her back to the reunion. A short time later,
Breax left the reunion and went home. She became concerned when Joyce neither
returned home nor answered her cell phone. (2) 

 Daniel Molina and his girlfriend, Shelley Uresti, testified that on the evening of June
24, they observed a blue or silver SUV stopped in the middle of the road near the site
where the reunion was held. Both testified they saw a man and woman struggling in the
roadway; the woman was trying to get away. The man pinned the woman down and shot
her. The man then left the scene in the SUV. Molina testified that a second person may
have been in the vehicle because the man entered and exited the vehicle several times
from the passenger side. 

 Randy Graffagnino is a legal assistant with the Provost Umphrey Law Firm. He
testified he works directly for Walter Umphrey. Graffagnino knew appellant and Joyce
because they both worked at a ranch/lodge owned by Umphrey. Graffagnino testified that
he frequented the ranch on weekends, and that he and appellant were "pretty good
friends." Graffagnino heard a news report that Joyce had been killed; he also learned that
appellant was a suspect and was not in custody. Graffagnino called appellant on his cell
phone to persuade him to turn himself in. Graffagnino and appellant had several cell
phone conversations. Graffagnino testified that appellant said he did not kill his wife, but
some "other person" had done it. Appellant also said he had "messed up" and "was in real
trouble this time." Graffagnino also testified that appellant knew he (Graffagnino) was
talking to the police about their conversations in order to facilitate appellant's peaceful
surrender. Appellant wanted to see Joyce before she was buried and agreed to an
arranged meeting with Graffagnino, with the consent of the police, to turn himself in. 
However, appellant did not show up at the designated location. Several days later,
appellant called Graffagnino and said he had turned himself in. Graffagnino testified that
he told appellant on several occasions that the law firm could not represent him. 

II. Attorney-Client Privilege


 In his first issue, appellant contends the trial court erred in admitting Graffagnino's
testimony because he mistakenly believed Graffagnino was a lawyer and accordingly, that
his conversations with Graffagnino were protected by the attorney-client privilege. 
Specifically, appellant argues that Graffagnino's testimony was used "to convince the jury
that appellant must be guilty because he had confessed to Graffagnino that he had
'messed up and was in real trouble' and that he was on the run, indicating guilt." 

A. Standard of Review and Applicable Law 


 In Henderson v. State, the court of criminal appeals noted that at least one federal
circuit has held that "mixed questions of law and fact, regarding the applicability of the
attorney-client privilege to particular communications," must be reviewed de novo. (3) The
Henderson court also recognized its own precedent in applying de novo review to mixed
questions of law and fact. (4) A question of fact exists when the evidence does not
conclusively establish the existence of an attorney-client relationship. (5) When a fact issue
is raised with regard to attorney-client privilege, it is within the trial court's discretion to
determine whether an attorney-client relationship existed. (6) 

 The invocation of attorney-client privilege depends on the existence of an attorney-client relationship, which has been defined as a contractual relationship where an attorney
agrees to render professional services for a client. (7) An attorney-client relationship may be
expressly created by contract or implied by the actions of the parties. (8) For the relationship
to be established, "the parties must explicitly or by their conduct manifest an intention to
create it. To determine whether there was a meeting of the minds, we use an objective
standard examining what the parties said and did and do not look at their subjective states
of mind." (9) The burden of establishing attorney-client privilege rests on the party asserting
the privilege. (10) 

B. Analysis


 The trial court held a pre-trial hearing, outside the jury's presence, regarding "[t]he 
issue of mistake of facts as to attorney/client privilege." The only witnesses were appellant
and Graffagnino. Graffagnino testified that after he heard appellant was a possible
suspect in the shooting, he called him to "help him turn himself in before . . . he got shot." 
Graffagnino testified that he told appellant "absolutely" that he could not help him legally. 
According to Graffagnino, the "first" and "last" things he told appellant were that he could
not legally help him. On cross-examination, Graffagnino stated that he told appellant that
the Umphrey Firm could not represent him because of a conflict arising from the fact that
appellant and Joyce were both employed by Umphrey. 

 Appellant testified that he thought Graffagnino was a lawyer and Umphrey's
bodyguard. According to appellant, his "first impression" of Graffagnino's initial call was
that Graffagnino wanted to help him. When appellant returned Graffagnino's call, he had
in mind "[g]etting some assistance as far as what [he] should do." Appellant clarified that
he meant "[l]egal assistance" and that he was trying to "find out if Mr. Umphrey could help
me." Appellant denied that Graffagnino told him that he could not help him legally. 
Appellant testified that he asked Graffagnino about "legal help" on more than one occasion,
and was ultimately told that the firm could not represent him because of the conflict. 
According to appellant, he expected his communications with Graffagnino to be kept in
confidence because they were "friends" and because he believed Graffagnino was an
attorney. On cross-examination, appellant stated that he asked Graffagnino about legal
representation "one time." 

 At the conclusion of the hearing, the trial court found there was no attorney/client
relationship between appellant and Graffagnino, and because no attorney/client privilege
was applicable, Graffagnino's statements were admissible.

 We agree with the State that the evidence does not conclusively establish an
attorney-client relationship between appellant and Graffagnino. Graffagnino testified that
he explicitly told appellant he could not help him legally. Appellant testified he asked for
legal help on more than one occasion and was eventually told that the firm could not
represent him. Graffagnino's testimony does not support a finding that an attorney-client
relationship existed. Appellant's expectation that his communications with Graffagnino
were confidential because they were "friends" and because he believed Graffagnino was
a lawyer is not relevant. (11) Because no attorney/client relationship was established, the trial
court did not abuse its discretion in admitting Graffagnino's testimony. Appellant's first
issue is overruled. 

 III. Limitation of Cross-Examination


 In his second issue, appellant contends the trial court erred by limiting the cross-examination of State's witness, Breaux, during the guilt/innocence portion of the trial. In
his third issue, appellant contends that during the punishment phase of the trial, the trial
court erred by limiting the cross-examination of Atlas Gordon, Joyce's nephew. Appellant
claims his trial counsel was attempting to elicit additional information concerning the
"relationships of the parties" and was attempting to ask Gordon questions pertaining to the
"nature of the faith and belief of Joyce Volrie [victim]." We address these issues together. 
 

A. Standard of Review and Applicable Law


 A trial court's evidentiary rulings are subject to review for an abuse of discretion. (12) 
Likewise, the trial court enjoys broad discretion in the conduct of the trial and the
questioning of witnesses; its rulings on these matters will also remain undisturbed absent
an abuse of discretion. (13) 

 The nature of the excluded evidence must be considered in order to determine what
steps must be taken to preserve review of a complaint regarding exclusion of evidence. (14) 
The Texas Court of Criminal Appeals has recognized a distinction between a situation
where the defendant desires to elicit certain, specific responses from the State's witness,
but is precluded by the trial court from doing so, and a situation where the defendant is not
permitted to question the State's witness about a certain general subject that might affect
the witness's credibility. (15) 

 In the former situation, dealing with exclusion of cross-examination intended to elicit
specific evidence, the defendant has two options for preserving error for appellate review: 
(1) have the witness testify and answer the specific questions the defendant desires to ask,
but has been precluded from asking, in the presence of the jury; or (2) make an offer of
proof of the questions the defendant would have asked and the answers expected had such
questioning in the presence of the jury been permitted. (16) In such a situation, absent one of
the aforementioned methods, any claim of error is not preserved for appellate review. (17) 

 However, when a trial court excludes evidence designed to call into question the
witness's "bias, interest, prejudice, inconsistent statements, traits of character affecting
credibility, or evidence that might go to any impairment or disability affecting the witness's
credibility," the defendant has less rigid requirements to preserve error for appeal. (18) In that
situation, the defendant must merely establish the general subject matter on which he or
she desired to examine the witness and, if challenged, show on the record why such
evidence should be admitted. (19) We will uphold the trial court's ruling if it is correct on any
theory of the law applicable to the case, even if the trial court gave the wrong reason for its
ruling. (20) Trial court error regarding the admission of evidence is generally nonconstitutional
error. (21) In reviewing nonconstitutional error, we disregard the error if it did not affect the 
appellant's substantial rights. (22)


B. Analysis


 With regard to the limitation of the cross-examination of Breaux, the State concedes
that "the offered evidence was general in nature rather than specific," and does not contend
that appellant failed to preserve any error. During the cross-examination of Breaux, the
following exchange occurred:

Q [Appellant's counsel]: Have you ever taken any trips or vacations with
[appellant] and Joyce?


A [Breaux]: No.


Q: Has any of your family?


A: Yes.

 

Q: They have?


A: Yes.


Q: Who?


A: My mother, my sister, that's in the courtroom.


Q: Anybody else?


A: One time he did come to Mobil--

 

[Prosecutor]: Your Honor, I'm going to have to object as to what relevance
this is.


[Court]: Sustained.


[Defense counsel]: You won't let me explain, Your Honor?


[Court]: What is the relevance?


[Defense counsel]: Again, it has to do with the relationship of the parties. 
She's testified about a certain relationship, and I'm trying to elicit information
about the relationship.


[Court]: It's sustained. Move forward. Appellant argues he was attempting to respond to Breaux's testimony that Joyce 
did not want to have any contact with appellant and was "frightened to death" of him. 
According to appellant, he was attempting "to establish the congenial relationship between
appellant and the deceased and her family." The trial court sustained the State's objection
that testimony concerning appellant's relationship with Joyce's family was not relevant. We
agree with the trial court's ruling. Appellant's counsel's response, that he was "trying to
elicit information about the relationship," did not establish the relevance of appellant's past 
relationship with Joyce's family. Moreover, appellant's counsel had already elicited
testimony regarding a congenial past relationship between appellant and Joyce and some
members of Joyce's family. (23) We conclude the trial court did not abuse its discretion in
limiting appellant's cross-examination of Breaux. We overrule appellant's second issue. 

 In his third issue, appellant complains that during the punishment phase of the trial,
the trial court limited his cross-examination of Gordon regarding Joyce's religious beliefs. 
Specifically, appellant argues he was "attempting to show that Christian forgiveness must
be a part of [Joyce's] character." 

 The record reflects that the trial court sustained the State's objection as to the
relevance of appellant's question (to Gordon) regarding whether Christians are held to a
"higher standard" in "the way they conduct themselves." Again, we agree that appellant
failed to show how Joyce's religious beliefs--including whether she would have forgiven
appellant for murdering her--were relevant to appellant's punishment. We conclude the
trial court did not abuse its discretion in sustaining the State's objection. We overrule
appellant's third issue. 

IV. Improper Jury Argument


 In his fourth issue, appellant contends the trial court erred in allowing the State to
engage in improper jury argument during the punishment phase of trial. Specifically,
appellant complains that "[t]he prosecutor told the jury that appellant had been to the
penitentiary numerous times." Appellant argues that although he had been convicted and
sentenced on four separate crimes, his sentences were to run concurrently, and therefore,
the prosecutor's reference to "numerous" trips to the penitentiary was a "misstatement of
the evidence." In his brief, appellant suggests that the prosecutor's misstatement of the
evidence harmed him because the jury ultimately sentenced him to life imprisonment. 

A. Standard of Review and Applicable Law 
 

 We review an improper jury argument by examining the record in its entirety to
determine whether any erroneous statements were made, and if so, whether they were so
prejudicial as to deprive the appellant of a fair and impartial trial. (24) Permissible jury
argument falls into one of four areas: (1) summation of the evidence; (2) reasonable
deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4)
a plea for law enforcement. (25) Counsel is permitted the use of analogy to emphasize or
explain evidence. (26) Counsel is allowed wide latitude to draw inferences from the evidence
so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. (27)

In examining challenges to jury argument, we consider a remark in the context in which it
appears. (28) Generally, error resulting from improper jury argument is non-constitutional in
nature. (29) Thus, we disregard any error that does not affect the appellant's substantial
rights. (30)

B. Analysis


 The State argues that although "poorly stated," the prosecutor's comment was an
attempt to summarize the evidence. The State further argues that even if the prosecutor
erred in stating appellant had been to the penitentiary "numerous" times, any such error
was harmless. 

 We agree with the State that the prosecutor's comments were "nothing more than
an unintentional mischaracterization of the manner in which Appellant served sentences
in multiple cases." Moreover, we agree with the State that given the prosecutor's
subsequent description of appellant's prior convictions as "all violent," including "robbery
by assault," "assault with intent to murder," and two instances of "robbery by use of
firearms," we are unable to say that appellant was harmed by the prosecutor's technical
misstatement. (31) We hold that even assuming, without deciding, that the trial court erred
in overruling appellant's objection to the prosecutor's argument, appellant has failed to
show that he was harmed by any such error. We overrule appellant's fourth issue. 

V. Conclusion 


 Having overruled all of appellant's issues, we affirm the judgment of the trial court. 


 
 

 LINDA REYNA YAÑEZ,

 Justice




Do not publish. Tex. R. App. P. 47.2(b).


Memorandum opinion delivered and filed 

this the 16th day of August, 2007.
1. Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003).
2. Joyce had lived with Breaux for several months, after her separation from appellant. 
3. Henderson v. State, 962 S.W.2d 544, 551 (Tex. Crim. App. 1997) (quoting Cox v. Administrator U.S.
Steel & Carnegie, 17 F.3d 1386, 1413 (11th Cir.), opinion modified on other grounds, 30 F.3d 1347 (1994));
see State v. Martinez, 116 S.W.3d 385, 391 (Tex. App.-El Paso 2003, no pet.); State v. DeAngelis, 116
S.W.3d 396, 402-03 (Tex. App.-El Paso 2003).
4. Henderson, 962 S.W.2d at 551 (citing Villarreal v. State, 935 S.W.2d 134, 138 n.5 (Tex. Crim. App.
1996) (plurality opinion); id. at 139-11 (McCormick, J. concurring); id. at 141-45 (Clinton, J. concurring); id.
at 145-50 (Keller, J. concurring)). 
5. Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, 105 S.W.3d 244, 254 (Tex. App.-Houston [14th
Dist.] 2003, pet. denied); DeAngelis, 116 S.W.3d at 403. 
6. See Jackson v. State, 516 S.W.2d 167, 175 (Tex. Crim. App. 1974). 
7. Sutton v. Estate of McCormick, 47 S.W.3d 179, 182 (Tex. App.-Corpus Christi 2001, no pet.); 
Martinez, 116 S.W.3d at 392; Tanox, Inc., 105 S.W.3d at 254.
8. Sutton, 47 S.W.3d at 182; Martinez, 116 S.W.3d at 392; Tanox, 105 S.W.3d at 254.
9. Sutton, 47 S.W.3d at 182 (quoting Roberts v. Healey, 991 S.W.2d 873, 880 (Tex. App.-Houston
[14th Dist.] 1999, pet. denied) (citations omitted)). 
10. See id. at 181
.
11. See Sutton, 47 S.W.3d at 182. 
12. Mumphrey v. State, 155 S.W.3d 651, 660 (Tex. App.-Texarkana 2005, pet. ref'd) (citing Green v.
State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996)). 
13. Id. 
14. Id. at 661.
15. Id. (citing Virts v. State, 739 S.W.2d 25, 29 (Tex. Crim. App. 1987); Koehler v. State, 679 S.W.2d
6, 9 (Tex. Crim. App. 1984)).
16. Id. 
17. Id. 
18. Id. at 662 (quoting Virts, 739 S.W.2d at 29). 
19. Id.; Virts, 739 S.W.2d at 29. 
20. Laney v. State, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).
21. Stewart v. State, 221 S.W.3d 306, 310 (Tex. App.-Fort Worth 2007, no pet. ) (citing Solomon v.
State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)).
22. Id.; see Tex. R. App. P. 44.2(b). 
23. See Guerra v. State, 942 S.W.2d 28, 33 (Tex. App.-Corpus Christi 1996, pet. ref'd) (noting no harm
results when evidence is excluded if other evidence of substantially the same nature is admitted). 
24. See Stewart, 221 S.W.3d at 313.
25. See id.
26. Broussard v. State, 910 S.W.2d 952, 959 (Tex. Crim. App. 1995).
27. Gaddis v. State, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).
28. Id. 
29. See Martinez v. State, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000).
30. Id. 
31. The jury found the enhancement allegations "true," and that appellant had been convicted of two
previous felony offenses.