COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

THE STATE OF TEXAS,
)
 No. 08-01-00205-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 409th District Court

)


GEORGE A. DEANGELIS,
)
 of El Paso County, Texas

)


 Appellee.
)
 (TC# 2000-0D0-4571)


O P I N I O N



 In this case of wide public interest bearing overtones of scandal and political intrigue, we
consider whether conversations between the Chief of Staff of the El Paso Police Department and an
Assistant City Attorney are protected by the attorney-client privilege. Confidential information was
leaked to the local newspaper and a television station concerning an ongoing investigation into
administrative issues within the police department. Assistant Chief George DeAngelis and Deputy
Chief Cerjio Martinez were considered possible suspects. A criminal investigation into the leak
itself focused on misuse of official information proscribed by Section 39.06 of the Texas Penal Code. 
Neither DeAngelis nor Martinez was indicted for that offense. Instead, they were indicted for
aggravated perjury based on inconsistencies between sworn statements to the grand jury and
surreptitiously tape-recorded conversations with El Paso Assistant City Attorney, Stephanie Osburn. 
After indictment, DeAngelis sought suppression of all evidence obtained from Osburn based upon
attorney-client privilege. Following evidentiary hearings, the trial court suppressed all of
DeAngelis's statements to and conversations with Osburn.

 The State has filed several interlocutory appellate proceedings arising from the prosecution
of DeAngelis and Martinez. This appeal was previously dismissed for want of jurisdiction based
upon then-existent precedent. (1) The Court of Criminal Appeals reversed and remanded for
consideration on the merits. State v. DeAngelis, 53 S.W.3d 905 (Tex.App.--El Paso 2001), rev'd,
71 S.W.3d 345 (Tex.Crim.App. 2002). We now undertake that task. We have endeavored to offer
a complete factual summary but large portions of the record were sealed by the trial court. We have
reviewed all documents under seal but will avoid direct reference to them.

FACTUAL SUMMARY
 

 George DeAngelis has been an officer with the El Paso Police Department for more than
twenty-seven years. At the time of the events in issue, he was the Assistant Chief of Police, second
in command, and Chief of Staff. (2) He was in charge of the Office of Regional Operations, which
supervises the five regional commands. He conducted oversight of SWAT, Canine, Bomb Squad,
and the Headquarters Traffic Unit. He was also the chairperson of the Shooting Review Board
which reviews policy compliance by any officer who discharges a weapon either in the line of
duty or off-duty. Cerjio Martinez, a deputy chief in the Department, has also been indicted
for perjury; his case proceeds separately and is presently before us in State v. Martinez, Cause No.
08-01-00212-CR. 

 Stephanie Osburn began employment as an Assistant City Attorney in April 1999. She
described her job as representing the City of El Paso on department disciplinary matters, criminal
subpoenas, and expungements. She was assigned to Internal Affairs at the police department and
maintained an office there as well as at City Hall. Police officers were agents of the City who fell
within the representation umbrella. Osburn dispensed legal advice to the upper echelons of the
police department--captains and above. As was common practice within the City Attorney's Office,
Assistant City Attorneys routinely addressed documents to individual police officers bearing a label
that the communications were privileged. Osburn thought she had major input into the decisions
made by the police leadership and hoped they would act on her advice. 

 On or about August 27, 1999, DeAngelis met with a confidential informant and received
information concerning illegal activity by Officer Luis Cortinas, who served as the personal
administrative assistant to the Chief of Police, Carlos Leon. Cortinas had allegedly provided vehicle
descriptions and license plate numbers of narcotics officers to individuals associated with the drug
trade. On August 30, 1999, DeAngelis contacted the FBI to confirm what the informant had told
him. DeAngelis was told that the Cortinas case had been closed because of his status as Leon's
assistant and the FBI did not want to damage its working relationship with the police department. 
DeAngelis drafted a letter memorandum to Chief Leon which he delivered the next day. In the
memo, he formally requested that Cortinas be removed as the Chief's administrative assistant and
that an investigation be conducted. DeAngelis specifically asked Leon to keep the memo
confidential and that Cortinas not be made aware of it. Cortinas was reassigned on September 1,
1999, but no investigation followed. 

 In January 2000, DeAngelis showed Osburn the letter memo that he had written to Chief
Leon. For the next several months, Osburn and DeAngelis spoke several times a day. The calls were
occasionally about work, but tended to be more personal in nature (3) and lasted anywhere from one
minute to two hours, according to telephone records. DeAngelis would also call her at home on her
personal cell phone during the evening hours. He often criticized Chief Leon in his conversations
with her.

 By March, DeAngelis suspected that Leon had told Cortinas about the memo. DeAngelis
was approached by Assistant Chief J.R. Grijalva, who told him that rumors about a memo had been
circulating and that the media was interested. He said if the letter became public, it would "take
down" the mayor and the Chief. DeAngelis denied knowing anything about the memo at that point. 
In April, DeAngelis received what he considered a questionable travel request from Cortinas. Upset
by the request, DeAngelis met with Leon and asked him again to initiate an investigation into
Cortinas's activities. DeAngelis asked Leon why he was so hesitant to take any action against
Cortinas and Leon replied, "I owe him." When DeAngelis persisted, Leon told him to conduct his
"stupid investigation" and to assign Assistant Chief Grijalva and Deputy Chief Patrick Gailey. Once
Leon authorized him to start the investigation, DeAngelis briefed Grijalva, Gailey, Assistant City
Attorney Chris Borunda, the FBI, and Assistant Chief Richard Wiles, who was the head of Internal
Affairs.

 On April 13, DeAngelis lodged a formal complaint with the City concerning the
administrative issues raised in his August 1999 memo as well as other serious allegations of
misconduct by Chief Leon. Assistant City Attorney Chris Borunda began an investigation.
DeAngelis was placed on sporadic administrative leave but his contact with Osburn continued. 
During many of their conversations, DeAngelis talked about expecting retaliation and wanting
whistleblower protection. Osburn encouraged him to use the word "whistleblower" and told him
to document any retaliatory action. DeAngelis communicated with several private attorneys for legal
advice on his whistleblower claim against the City. Chief Leon was given notice and told to "cease
and desist" any retaliation, but DeAngelis claimed he continued to be under police surveillance. 

 On May 26, a sixteen-page synopsis of the Cortinas investigation was finalized. DeAngelis
arranged for copies to be delivered to Borunda and the FBI and left his personal copy on his desk
in a folder. Around May 30, Osburn, DeAngelis, and Martinez had lunch together. There was a
general venting by all of them concerning their dissatisfaction with Chief Leon. DeAngelis
commented that he was considering retirement and that he could "go public" at that point and talk
with the media.

 In early June, The El Paso Times requested a copy of the sixteen-page Cortinas report. 
DeAngelis received a telephone call from Patrick McDonnell, a reporter, advising DeAngelis that
the newspaper planned to run a story involving criminal allegations against Cortinas. Toward the
end of the month, Borunda submitted her investigative report of DeAngelis's formal complaint to
the mayor, who publicly reprimanded Chief Leon on June 26. In their conversations with one
another, Osburn, DeAngelis, and Martinez criticized the accuracy and credibility of Borunda's
investigation. DeAngelis thought that little action had been taken against Chief Leon and he was
frustrated with the results, which he termed a "whitewash." 

 The very next day, an El Paso television station reported that it had received a sixteen-page
confidential report relating to a criminal investigation of Officer Cortinas. The report was
purportedly leaked by an anonymous source within the El Paso Police Department. The El Paso
Times printed the story on June 28. The same day, it submitted an open records request about other
allegations of misconduct. Assistant Chief Richard Wiles, head of Internal Affairs, initiated a
separate investigation into the leak. (4) Wiles assigned Lieutenant David Norman to the investigation,
and ultimately, the Texas Rangers were called in to assist. Osburn was relieved of her duties with
the police department in late June, (5) but she did not alert DeAngelis to the fact.

 On July 6 or 7, Martinez called Osburn and asked if she would be willing to talk to the media
about the flaws in Borunda's investigation. She declined and reported the request to Detective
George Althoff. On August 2, Norman confronted Osburn and accused her of misusing official
information. He threatened her with criminal prosecution and the loss of her job and law license. 
When Osburn asked what he wanted her to do, Norman presented her with an immunity agreement
prepared in advance and urged her cooperation in tape recording conversations with both Martinez
and DeAngelis. Osburn did not discuss these events with anyone else in the City Attorney's office
before agreeing to participate. The calls were placed from City Hall and Norman orchestrated the
conversations. For purposes of the call to DeAngelis, they fabricated a story about a new
investigation of Cortinas in an effort to determine if the falsehood would trigger an open records
request from the media and clearly pinpoint DeAngelis as the source. (6) Osburn called DeAngelis
while Norman taped the conversation. She began by telling DeAngelis that she was working late,
to lead him to believe that the purpose of the call was not social. She then told him that the City had
just received an open records request from one of the television stations, which allowed her to segue
into contacts with the media in general. DeAngelis denied releasing either the Cortinas report or the
letter memo to Chief Leon. He did acknowledge that the media had called him about the report, but
he didn't know where they had obtained their information. Osburn then returned to the new Cortinas
investigation:

 Osburn: Oh, so apparently that PID's been initiated so --

 DeAngelis: Great. That's great.

 Osburn: -- I mean I don't know if you want to let your -- your contacts at the
media know anything.


 DeAngelis: Yeah, I'm gonna let Patrick know. 

Osburn made another attempt to bait DeAngelis in a telephone call on August 14, but she believed
he had become suspicious.

 In his testimony to the grand jury, DeAngelis denied speaking with anyone about contacts
with the media and claimed he had not talked with Osburn since he went on vacation June 2 except
for her phone call on August 14, the day before his grand jury appearance. Consequently, based on
inconsistencies between the taped conversation with Osburn and his testimony to the grand jury,
DeAngelis was indicted for aggravated perjury. He filed a motion to suppress all evidence obtained
from Osburn based upon attorney-client privilege. 

 The testimony of Stephanie Osburn appears in the record by virtue of her appearance before
the grand jury, her appearance at the suppression hearing, and her sworn deposition. She testified
that although DeAngelis was talking to private attorneys about representation in a civil suit against
the City, he still communicated with her. She emphasized that DeAngelis never asked her to be his
personal attorney and she never represented DeAngelis in his individual capacity. Yet she admitted
that she had referred to DeAngelis as her client on many occasions. (7) DeAngelis apparently believed
her, because in one of the many letters and cards she had received from him, he told her, "I know you
can't say anything because you are my attorney." In another note, he wrote: "I trust you and know
that it's privileged communication between attorney and client." By the time of the suppression
hearing, Osburn expressed an understanding of how DeAngelis could assume that the privilege
existed and that his comments to her were made in confidence.

STANDARD OF REVIEW

 The State argues that although the issue is not entirely settled, we are to review de novo the
applicability of the attorney-client privilege and the exclusion of evidence resulting from a violation
of the privilege. In Henderson v. State, (8) the Court of Criminal Appeals noted that at least one federal
circuit holds that "mixed questions of law and fact, regarding the applicability of the attorney-client
privilege to particular communications" must be reviewed de novo. Cox v. Administrator U.S. Steel
& Carnegie, 17 F.3d 1386, 1413 (11th Cir.), opinion modified on other grounds, 30 F.3d 1347
(1994), cert. denied, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). It also recognized its
own precedent in applying de novo review to mixed questions of law and fact. Villarreal v. State,
935 S.W.2d 134, 138 n.5 (Tex.Crim.App.1996)(plurality opinion); id. at 139-41 (McCormick, J.
concurring); id. at 141-45 (Clinton, J. concurring); id. at 145-50 (Keller, J. concurring). With regard
to motions to suppress, however, we review a trial court's ruling for an abuse of discretion. 
Villarreal, 935 S.W.2d at 138; Brewer v. State, 932 S.W.2d 161, 166 (Tex.App.--El Paso 1996, no
pet.). The trial judge is the sole and exclusive trier of facts at a suppression hearing. Romero v.
State, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990); Brewer, 932 S.W.2d at 166. Therefore, an
appellate court must defer to a trial court's determination of historical facts supported by the record,
especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. 
Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997); Gordon v. State, 4 S.W.3d 32, 35
(Tex.App.--El Paso 1999, no pet.). Accordingly, we will defer to the trial court's determination of
historical facts, but review de novo the application of law to those facts.

ATTORNEY-CLIENT PRIVILEGE

 DeAngelis contends that his conversations with Osburn, including the tape recordings, are
protected by attorney-client privilege. Invocation of the privilege is dependent upon the existence
of an attorney-client relationship, which has been defined as a contractual relationship whereby an
attorney agrees to render professional services for a client. Tanox, Inc. v. Akin, Gump, Strauss,
Hauer & Feld, 105 S.W.3d 244, 254 (Tex.App.--Houston [14th Dist.] 2003, pet. filed), citing Mellon
Serv. Co. v. Touche Ross & Co., 17 S.W.3d 432, 437 (Tex.App.--Houston [1st Dist.] 2000, no pet.).


Formation of the Attorney-Client Relationship


 The relationship may be expressly created by contract, or it may be implied from the actions
of the parties. Tanox, 105 S.W.3d at 254, citing Sutton v. Estate of McCormick, 47 S.W.3d 179, 182
(Tex.App.--Corpus Christi 2001, no pet.); Vinson & Elkins v. Moran, 946 S.W.2d 381, 405
(Tex.App.--Houston [14th Dist.] 1997, writ dism'd by agr.). The determination of whether there is
a meeting of the minds must be based on objective standards of what the parties did and said and not
on their alleged subjective states of mind. Terrell v. State, 891 S.W.2d 307, 313 (Tex.App.--El Paso
1994, pet. ref'd). A question of fact exists when the evidence does not conclusively establish the
existence of an attorney-client relationship. Tanox, 105 S.W.3d at 254; Sutton, 47 S.W.3d at 182;
Kanow v. Brownshadel, 691 S.W.2d 804, 805-06 (Tex.App.--Houston [1st Dist.] 1985, no writ).

Scope of the Privilege


 The scope of the attorney-client privilege is defined by the rules of evidence. Tex.R.Evid.
503. The privilege is intended to allow unrestrained communication and contact between the
attorney and client in all matters in which the attorney's professional advice or services are sought,
without fear that these confidential communications will be disclosed by the attorney, voluntarily
or involuntarily, in any legal proceeding. Huie v. DeShazo, 922 S.W.2d 920, 922 (Tex. 1996); In
re Toyota Motor Corp., 94 S.W.3d 819, 822 (Tex.App.--San Antonio 2002, pet. denied). Rule 503
protects confidential communications "made for the purpose of facilitating the rendition of
professional legal services to the client." Tex.R.Evid. 503(b)(1); Huie, 922 S.W.2d at 922; In re
ExxonMobil Corp., 97 S.W.3d 353, 357 (Tex.App.--Houston [14th Dist.] 2003, no pet.). The
privilege applies not only to legal advice, but attaches to complete communications between an
attorney and the client. In re Carbo Ceramics Inc., 81 S.W.3d 369, 374 (Tex.App.--Houston [14th
Dist.] 2002, no pet.); GAF Corp. v. Caldwell, 839 S.W.2d 149, 151 (Tex.App.-- Houston [14th Dist.]
1992, orig. proceeding). The subject matter of the information contained in the communication is
irrelevant when determining whether the privilege applies. See Marathon Oil Co. v. Moye, 893
S.W.2d 585, 589 (Tex.App.--Dallas 1994, no writ).

 For a communication to be privileged, it must appear that the communication was made by
a client seeking legal advice from a lawyer in her capacity as such and the communication must
relate to the purpose for which the advice is sought; the proof, express or circumstantial, must
indicate the client's desire for confidence and secrecy. Duval County Ranch Co. v. Alamo Lumber
Co., 663 S.W.2d 627, 634 (Tex.App.--Amarillo 1983, writ ref'd n.r.e.); Ballard v. Ballard, 296
S.W.2d 811, 816 (Tex.Civ.App.--Galveston 1956, no writ). A communication is confidential if not
intended to be disclosed to third persons other than those to whom disclosure is made in furtherance
of the rendition of professional legal services to the client or those reasonably necessary for the
transmission of the communication. Tex.R.Evid. 503(b)(1). The attorney-client privilege confers
upon the client the right to prevent disclosure of communications at any stage of the criminal
proceedings.

Identity of the Client


 Having addressed the formation of the relationship and the nature of confidential
communications, we come to the pricklier issue of the role of the government lawyer and the
identification of the client. A "client" is:

 [A] person, public officer, or corporation, association, or other organization or entity,
either public or private, who is rendered professional legal services by a lawyer, or
who consults a lawyer with a view to obtaining professional legal services from that
lawyer.


Tex.R.Evid. 503(a)(1). A "representative of the client" is (A) a person having authority to obtain
professional legal services, or to act on advice thereby rendered, on behalf of the client, or (B) any
other person who, for the purpose of effectuating legal representation for the client, makes or
receives a confidential communication while acting in the scope of employment for the client. 
Tex.R.Evid. 503(a)(2)(A), (B). The Texas Disciplinary Rules of Professional Conduct also address
the issue:

 Rule 1.12. Organization as a Client


 (a) A lawyer employed or retained by an organization represents the entity. While
the lawyer in the ordinary course of working relationships may report to, and accept
direction from, an entity's duly authorized constituents, in the situations described
in paragraph (b) the lawyer shall proceed as reasonably necessary in the best interest
of the organization without involving unreasonable risks of disrupting the
organization and of revealing information relating to the representation to persons
outside the organization.


 (b) A lawyer representing an organization must take reasonable remedial actions
whenever the lawyer learns or knows that:


 (1) an officer, employee, or other person associated with the
organization has committed or intends to commit a violation of a
legal obligation to the organization or a violation of law which
reasonably might be imputed to the organization;


 (2) the violation is likely to result in substantial injury to the
organization; and


 (3) the violation is related to a matter within the scope of the lawyer's
representation of the organization. 


. . .



 (e) In dealing with an organization's directors, officers, employees, members,
shareholders or other constituents, a lawyer shall explain the identity of the client
when it is apparent that the organization's interests are adverse to those of the
constituents with whom the lawyer is dealing or when explanation appears
reasonably necessary to avoid misunderstanding on their part.


Tex.Disciplinary R.Prof'l Conduct 1.12. Comment 3 advises that when an employee of the
entity communicates with the entity's attorney in the employee's organizational capacity, the
communication is privileged. But comment 4 cautions that there are times when the entity's interest
may become adverse to that of its employee:

 Clarifying the Lawyer's Role


 4. In such circumstances the lawyers should advise any constituent, whose
interest the lawyer finds adverse to that of the organization of the conflict or potential
conflict of interest, that the lawyer cannot represent such constituent, and that such
person may wish to obtain independent representation. Care should be taken to
assure that the individual understands that, when there is such adversity of interest,
the lawyer for the organization cannot provide legal representation for that
constituent individual, and that discussions between the lawyer for the organization
and the individual may not be privileged insofar as that individual is concerned. 
Whether such a warming [sic] should be given by the lawyer for the organization to
any constituent individual may turn on the facts of each case.


While comment 9 acknowledges that "defining precisely the identity of the client and prescribing
the resulting obligations of such lawyers may be more difficult in the government context," it
suggests a different balance may be appropriate between maintaining confidentiality and assuring
that a wrongful official act is prevented inasmuch as public business is involved. Tex.Disciplinary
R.Prof'l Conduct 1.12 cmt. 9. Borunda clearly understood this requirement. (9) We cannot say the
same for Osburn. (10)

 The State contends that the recorded telephone call was personal in nature and not protected
by the attorney-client privilege. We disagree. Osburn did not place the call to DeAngelis from her
home. It was an orchestrated call made from her office after hours at the direction of Norman and
his investigation team. To ensure the appearance of City business, Osburn and Norman wanted any
caller identification device to reflect a business number rather than Osburn's personal telephone
number. Osburn was directed to tell DeAngelis the fabricated stories to encourage him to talk about
the media leaks in hopes of setting him up. While Osburn vacillated in her opinion of
the applicability of the privilege, by the time of the suppression hearing she believed that the
attorney-client privilege protected comments made to her in confidence. DeAngelis did as well, as
evidenced by his notes to her. Although he engaged civil litigators to pursue his private
whistleblower cause of action, he continued to discuss with Osburn certain improprieties in the
police department which he believed jeopardized its reputation. Osburn shared his negative opinions
about Chief Leon and never suggested to him that these communications were anything but
confidential. While City policy clearly prohibits individual representation, we cannot conclude that
a violation of City policy defeats the privilege. 

 According the appropriate deference to the trial court's determination of these historical facts
and its unique ability to observe the credibility, demeanor and sincerity of the witnesses, we find
ourselves unable to fault Judge Medrano's conclusion that DeAngelis's conversations with Osburn
and any fruits stemming therefrom were protected by attorney-client privilege. 

 CRIME-FRAUD EXCEPTION


 The State next contends that DeAngelis sought Osburn's assistance in releasing confidential
information to the media thus implicating the crime-fraud exception to the attorney-client privilege: 


 (d) Exceptions. There is no privilege under this rule: 

 (1) Furtherance of crime or fraud. If the services of the lawyer were sought or
obtained to enable or aid anyone to commit or plan to commit what the client knew
or reasonably should have known to be a crime or fraud. 


Tex.R.Evid. 503(d)(1). The plain language of the rule indicates that a continuing or future crime
is not enough; the attorney's services must be sought to aid in the commission of the crime. 
Henderson, 962 S.W.2d at 553. The lawyer's knowledge of the client's purpose may enable the
lawyer to prevent the commission of the prospective crime. When the threatened injury is grave, the
lawyer's interest in preventing the harm may be more compelling than the interest in preserving the
confidentiality of information. Id. at 554-55.

 In order for the exception to apply, the proponent must first establish a prima facie showing
that a crime or fraud was ongoing or about to be committed. Granada Corp. v. First Court of
Appeals, 844 S.W.2d 223, 227 (Tex. 1992)(orig. proceeding); Volcanic Gardens Management Co.,
Inc. v. Paxson, 847 S.W.2d 343, 347 (Tex.App.--El Paso 1993, orig. proceeding). Whether the
proponent has established a prima facie showing is a matter for the court to decide. Volcanic
Gardens, 847 S.W.2d at 347. The evidence must set forth sufficient proof to support a finding; mere
allegations are insufficient. In re Monsanto Co., 998 S.W.2d 917, 934 (Tex.App.--Waco 1999, orig.
proceeding); Cigna Corp. v. Spears, 838 S.W.2d 561, 569 (Tex.App.--San Antonio 1992, orig.
proceeding). Because the State attempts to show that DeAngelis was responsible for leaking the
confidential information to the media and sought Osburn's assistance in doing so, it bears the burden
of establishing that the crime-fraud exception applies.

 DeAngelis has not been indicted for releasing confidential information to the media, nor have
we found affirmative evidence that either he or Osburn was the source of the leaks. Although
Osburn testified that DeAngelis had talked about retiring and "going public," DeAngelis denied any
discussions about releasing information to the media.

 We turn now to the tape recording of the August 2 telephone conversation. When Osburn
asked him directly if he had leaked the Cortinas report to the press, DeAngelis denied it. He also
denied leaking the letter memo he had written to Chief Leon. Osburn was told to lie to DeAngelis
and tell him that a new PID or Preliminary Investigation Document had been formulated for
Cortinas. All of this was admittedly fabricated in an effort to set him up. These efforts resulted in
the following exchange:

 Osburn: Oh, so apparently that PID's been initiated so --

 DeAngelis: Great. That's great.

 Osburn: -- I mean I don't know if you want to let your -- your contacts at the
media know anything.


 DeAngelis: Yeah, I'm gonna let Patrick know.

 The State contends that DeAngelis sought or used Osburn's services to further the criminal
activity in question, in leaking what he knew to be confidential information to the media. See
Henderson, 962 S.W.2d at 553. DeAngelis was certainly upset with Chief Leon and he was of the
opinion that Borunda's investigation was less than thorough. Although Osburn was familiar with
DeAngelis's yearning to go public and she was involved in several of the conversations, it does not
appear that her assistance was ever sought or that DeAngelis ever looked to her for advice on leaking
the reports. Because a mere allegation is insufficient, the State has yet to establish a prima facie
case. We conclude that the exception does not apply so as to pierce the privilege. We overrule the
State's sole issue for review and affirm the judgment of the trial court.


August 28, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 1

Larsen, McClure, and Chew, JJ.


(Publish)
1. By virtue of State v. Roberts, 940 S.W.2d 655 (Tex.Crim.App. 1996), the State could not appeal from an
order excluding evidence pursuant to Rule 503. We applied Roberts in State v. Medrano, 987 S.W.2d 600, 602
(Tex.App.--El Paso 1999), vacated by 67 S.W.3d 892 (Tex.Crim.App. 2002), on remand 86 S.W.3d 369 (Tex.App.--El Paso 2002, pet. granted) in which we concluded that a motion to suppress evidence is a term of art contemplating more
than simple exclusion pursuant to general rules of evidence such that the statute does not allow interlocutory review of
general pretrial evidentiary rulings. The Court of Criminal Appeals granted review in Medrano, and reconsidered and
overruled its decision in Roberts. State v. Medrano, 67 S.W.3d 892 (Tex.Crim.App. 2002). In the wake of Medrano,
the court likewise reversed and remanded this case for consideration on the merits.
2. Testimony revealed the following hierarchy within the police department: lieutenant, captain/commander
(who perform different jobs but hold the same rank), deputy chief, assistant chief, chief of police.
3. While the record is silent on the details, it does reveal that Osburn was also engaged in a personal relationship
with Martinez during this period of time.
4. Wiles ultimately replaced DeAngelis after DeAngelis was placed on administrative leave. 
5. The sealed portion of the record reveals the reason for her reassignment but we will not divulge it here.
6. Norman testified that he spoke with Wiles concerning the information to be relayed to DeAngelis "because
we were planning to -- to, I hate to say this, but set up, give him false information and see if they went for that bait, to
see if anybody would inquire, make an open records request for that information." 
7. Osburn acknowledged telling Fred Haiman on more than one occasion not to talk with DeAngelis because
DeAngelis was her client. Haiman is the local counsel for the Combined Law Enforcement Association of Texas
(CLEAT). In common practice, CLEAT represented department employees in arbitration proceedings and the City
Attorney's Office represented the City. 
8. 962 S.W.2d 544 (Tex.Crim.App. 1997).
9. Borunda testified that DeAngelis told her he did not anticipate his interests would become adverse to those
of the City because his interest in initiating the investigation was to protect the reputation of the department rather than
for personal gain. He did ask her that if things changed, would the City provide him with an attorney or pay for him to
hire an attorney. "At that time, he was told that we could neither provide him with an attorney, nor could the City pay
for him to hire an attorney." 
10. The record does not indicate whether any disciplinary proceedings were initiated against Osburn and we
make no independent judgment of her conduct.