**Opinion issued January 10, 2017**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00960-CR

_____

**WILLIAM PORTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1430828**

---

# O P I N I O N

The State charged William Porter with murder. Porter pleaded not guilty, and a jury returned a verdict of guilty and assessed his punishment at 33 years' confinement. On appeal, Porter contends that the trial court erred in admitting testimony from Porter's attorney about that attorney's removal and secretion of a

bullet from the crime scene because it constitutes a privileged communication under the attorney-client privilege. We conclude that the attorney's conduct does not fall within the attorney-client relationship and thus does not fall within the privilege. We therefore affirm.

## BACKGROUND

*The murder*

On a Saturday evening in August 1986, Porter and his girlfriend, Anita Fries,[1] began using drugs at Porter's home. Porter was a drug dealer for the neighborhood. He was upset that several people, including the decedent, Gerald Oncale, owed money to him. When Porter learned that Oncale was nearby, Porter left the house and met Oncale around the corner. At that meeting, Oncale agreed to cash a check at a nearby convenience store to pay Porter the money that Oncale owed to him. Oncale cashed the check and paid Porter some of the money he owed. Oncale told Porter he had just purchased an "eight-ball" of cocaine and offered to share the drugs with Porter.

Porter invited Oncale to join him and Fries for the evening. The three returned to Porter's home. Oncale pulled his truck into the driveway behind Porter's vehicle. They went inside Porter's house and began using the drugs.

---

[1] By the time of trial, Anita Fries's surname was Olivo. For clarity, this opinion refers to her as Fries throughout.

The conversation turned to Oncale's source for his drug supply. Oncale revealed that he had obtained the drugs from the same individual that Porter used for his supply. Porter became angry with Oncale, who was seated on the couch in the living room. The argument became heated, and Porter, standing on the other side of the coffee table across from Oncale, drew his gun. Oncale, who was seated on the couch, began to stand up. Porter ordered Oncale to sit back down. Porter then shot Oncale, who fell backward on the couch, slid onto the floor, and died.

Fries panicked and ran to Porter's mother's house across the street. She told Porter's mother, Inga, what had happened. Inga instructed Fries to stay there while she went across the street to Porter's house. Fries watched as Porter dragged Oncale's body outside onto the front porch and went back inside. Porter retrieved a bucket of water and washed some of the blood off of the porch. Porter gathered the drugs in the house and placed them in a bag. He tied the bag with a length of fishing line, walked to a storm drain in the street nearby, and tied the bag to the grate of the storm drain so that the bag of drugs was hanging just below it.

Inga and Porter then staged the house to appear as if a robbery had occurred. Inga told Fries that they were going to call the police and told Fries not to reveal what had happened to the police. Inga threatened that something bad would happen to Fries and her children if Fries did not comply.

*The investigation*

Deputy J. Denholm of the Harris County Sheriff's Office arrived at the scene early that morning. Fries was standing outside Porter's house, and she confirmed that they had reported the shooting. As Denholm entered the house, he noticed that the front door had been splintered, but the deadbolt was undamaged. Oncale's body was on the floor just inside the door. Porter was kneeling over the body. Denholm observed that Oncale had been shot in the chest.

Denholm found no signs of struggle inside the house. At that time, Fries told Denholm that she was asleep when the shooting occurred and did not know what had happened. Porter told Denholm that he shot Oncale about 15 minutes before Denholm arrived, in self-defense, after he found Oncale kicking in the front door. Porter said that he knew Oncale but that they had not been getting along, and that Oncale should not have been at Porter's home.

Denholm placed Porter in his patrol car and went back into the house to continue his investigation. Denholm found the proffered explanation of the circumstances suspicious for several reasons: Oncale had no mask and was not armed; Oncale's truck was in the driveway; Fries and Porter stated that they had just been in bed, yet they were fully dressed; there were marks and blood smears on the front porch, indicating that Oncale's body had been dragged and that someone had tried to wipe up some of the blood; and there was an unexplained bloodstain on the

4

rug in the living room. Further, the reported timing of the incident was not consistent with the appearance of the body or of pooled blood nearby. The location of the bullet's entry and exit wounds also showed that the bullet had traveled downward through Oncale's body, which was not consistent with Porter's explanation of the events.

Denholm returned to the patrol car to check on Porter. Porter volunteered that he had never had to shoot anyone, and that after shooting Oncale, Porter had tried to resuscitate him and had carried Oncale outside. He also added that he had tried to drive Oncale to the hospital, but realized that Oncale's truck had blocked him in the driveway. Denholm suspected that Porter was "making stuff up on the fly."

Denholm and the other officers involved in the investigation into Oncale's death believed that Porter's house had been staged to make it look like a burglary had occurred. At the time, however, the investigation did not yield enough evidence to support a charge against Porter.

*The attorney's removal and secretion of material evidence*

Later that morning, after the police had left the scene, Porter paged Marshall Shelsy, a local attorney, who was involved in a personal relationship with Porter's sister at that time. Shelsy arrived at the scene of the crime and agreed to act as Porter's attorney. Shelsy then performed a walk-through at the house with each witness, including Fries.

5

When Fries and Shelsy walked through the house, Porter was not present. Fries led Shelsy to the living room and told Shelsy that she witnessed Porter shoot Oncale while Oncale was sitting on the living-room couch. She pointed out the middle cushion where Oncale had been seated.

Shelsy found a bullet hole in the couch cushion. He removed the cushion and moved the couch. He then found a bullet hole in the back of the couch close to the floor. Shelsy reached into the hole and pulled out a .45 caliber bullet. Shelsy placed the bullet into his pocket and said to Fries, "Never speak of it again."

Fries regretted lying to the police about the shooting. Several months after the incident, after she had ended her relationship with Porter, Fries went to the Harris County Sheriff's office. She gave a written statement explaining that she had not been truthful during the initial investigation, and she recounted that Porter shot Oncale while Oncale was seated on the couch inside the house. She also stated that Porter's attorney had removed the bullet from the crime scene. Fries testified similarly to these events at the trial.

*The renewed investigation*

More than 25 years later, in 2013, the sheriff's office renewed its investigation into Oncale's death. Sergeant E. Clegg spoke with Fries. Fries's responses were consistent with her 1987 written statement, in which she stated that Porter shot Oncale during an argument while Oncale was seated on the couch. She repeated to

Clegg her statements about her walk-through with Shelsy and the events relating to Shelsy's recovery and removal of the bullet.

The investigators then subpoenaed Shelsy to appear before a grand jury. Shelsy received immunity in exchange for his testimony, and he was ordered to provide truthful testimony to the grand jury. Shelsy initially was evasive in answering questions, but he eventually admitted to the grand jury that he had found the bullet, taken it from the crime scene and placed it in his files, and later discarded it. The grand jury indicted Porter for murder.

*Shelsy's testimony*

At the trial, the State sought to introduce the events relating to Shelsy's conduct at the crime scene as observational facts that were not privileged. The trial court held a hearing outside the presence of the jury to determine the admissibility and scope of Shelsy's testimony at trial. During the hearing, Shelsy testified that he and Porter had communications about the case, and the "focus of the investigation" when he did a walk-through with Porter was "[p]rincipally the front of the house." Shelsy then participated in a walk-through with Fries, where the "principal of [his] focus" was "the living room." Shelsy testified that Porter was not present when Shelsy examined the couch and removed the bullet.

Porter's counsel at trial objected that Shelsy's testimony was inadmissible evidence that fell within the attorney-client privilege. Counsel called Porter to the stand to confirm that Porter was asserting the privilege and did not desire to waive it. Before Shelsy testified, the trial court overruled the objection, but it limited Shelsy's testimony "as it specifically relates to the events relating to the observation and recovery of a projectile and what was done with the projectile." The court further warned, "In terms of [Shelsy] testifying as to what his observations were about the scene, what that means, what that characterizes, what it comports with, I'm not inclined to allow the State to get into that." More specifically, the trial court stated, "I'm going to limit it to . . . that he went in there, that he observed the thing on [the] couch, that he recovered the projectile and put it in his pocket."

Shelsy then testified before the jury that he met Porter through Porter's sister, whom Shelsy had been dating. Porter called Shelsy after the shooting, and Shelsy arranged to visit the next day, which was a Sunday. Shelsy arrived at the home around midday. According to his practice, he walked through the scene with each witness. While on the walk-through with Fries, Shelsy observed a "tear mark or a hole" in the front of the couch. Shelsy moved the couch and found a hole in the lower back of the couch. Shelsy noticed the bullet behind the couch; he recovered the bullet, showed it to Fries, and put it in his pocket. Shelsy put the bullet in a film canister and stored it with the notes he took during his interviews with Porter and

8

Fries. Shelsy kept the bullet with his files for about 25 years, after which time he discarded the bullet along with his old files. Shelsy acknowledged that his conduct could constitute evidence tampering, a felony under Texas law.

**DISCUSSION**

Porter contends that the trial court erred in denying his motion to exclude Shelsy's testimony because its admission violates the attorney-client privilege.

**A.     Applicable Law and Standard of Review**

We review the trial court's ruling denying applicability of a privilege for an abuse of discretion. *Carmona v. State*, 947 S.W.2d 661, 664 (Tex. Crim. App. 1997). We reverse the ruling only if "the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion." *Id.* (quoting *DuBose v. State*, 915 S.W.2d 493, 498 (Tex. Crim. App. 1996)). A party asserting a privilege has the burden of showing that the privilege applies. *McAfee v. State*, 467 S.W.3d 622, 645 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *see Carmona*, 947 S.W.2d at 663.

The Texas Rules of Evidence protect from disclosure the communications between a client and his counsel when they are kept confidential and are made to facilitate the rendition of legal services. *See* TEX. R. EVID. 503(b)(1); *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *McAfee*, 467 S.W.3d at 642–43.

9

The scope of the privilege is limited to communications "made by a client seeking legal advice from a lawyer in [the lawyer's] capacity as such and the communication must relate to the purpose for which the advice is sought." *State v. DeAngelis*, 116 S.W.3d 396, 404 (Tex. App.—El Paso 2003, no pet.), *quoted in McAfee*, 467 S.W.3d at 642. Disclosure by the attorney does not waive the privilege absent the client's consent. *McAfee*, 467 S.W.3d at 643 (citing *Carmona*, 947 S.W.2d at 663).

Subsection (b)(2) of Rule 503 provides for a "Special Rule in a Criminal Case." TEX. R. EVID. 503(b)(2). This special rule recognizes a privilege "to prevent a lawyer . . . from disclosing any other fact that came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship." *Id.*

**B.  Analysis**

This case presents the issue of whether the attorney-client privilege, including the special rule for criminal cases, protects from disclosure the attorney's description of conduct he engaged in to remove and secrete material evidence from the crime scene.

In that regard, Shelsy's testimony did not concern a communication that he had with Porter, nor work done to facilitate the rendition of legal advice. It concerned Shelsy's conduct in actively concealing available evidence from the authorities. Although Shelsy believed that he "was doing the right thing, protecting

10

[his] client," he admitted that his acts constituted tampering with evidence, a felony offense.

Neither Rule 503, nor the special rule for criminal cases, extend the privilege to bar testimony regarding attorney conduct that constitutes tampering with evidence. Such conduct is not in furtherance of the attorney-client relationship, which is required to invoke the privilege. *See Clark v. State,* 261 S.W.2d 339, 347 (Tex. Crim. App.) (op. on reh'g), *cert. denied*, 346 U.S. 855, 74 S. Ct. 69 (1953) (holding that attorney's statement to client to "get rid of the weapon and sit tight" overheard by telephone operator was not privileged). Texas Disciplinary Rule 1.05 and Texas Rule of Evidence 503 prohibit the use of the attorney-client privilege to protect a client seeking a lawyer's assistance to commit a crime or fraud. *Mixon v. State*, 224 S.W.3d 206, 210 n.1 (Tex. Crim. App. 2007). Concomitantly, when a lawyer engages in tampering with evidence, with or without the client's knowledge, he is not engaged in the rendition of legal services for that client. *See* TEX. R. EVID. 503(a)(1), (3) (defining "client" as one who "is rendered professional legal services by a lawyer" or "consults a lawyer with a view to obtaining professional legal services" and "lawyer" as a person authorized to practice law).

In *Clark v. State*, the Court of Criminal Appeals explained that the attorney-client privilege is constrained, by definition, to the provision of legal services, not to include the commission of a crime. 261 S.W.2d at 347; *see also* TEX. R. EVID. 503(d)(1) (noting that the privilege does not apply "[i]f the lawyer's services were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonable should have known to be a fraud."). In rejecting the claim of privilege in *Clark,* the Court reasoned:

> One who knowing that an offense has been committed and conceals the offender or aids him to evade arrest or trial becomes an accessory. The fact that the aider may be a member of the bar and the attorney for the offender will not prevent his becoming an accessory.

261 S.W.2d at 347. The Court held that the overheard conversation was admissible because the statement was "not within the realm of legitimate counsel and employment." *Id.*

Shelsy's testimony concerning his actions in taking and secreting the bullet is subject to a similar analysis—the acts to which he testified fall outside the privilege itself. Shelsy was dating Porter's sister at the time. He told the jury that he removed and then stored the bullet with his files and, after 25 years, he discarded the bullet with his old files. Although Shelsy subjectively may have considered his conduct to be in his client's interest, that conduct does not, as a matter of law, constitute the rendition of professional legal services. *See Clark*, 261 S.W.2d at 347.

Porter contends that Rule 503(b)(2)'s special rule for criminal cases broadens the attorney-client privilege to include Shelsy's testimony because Shelsy related facts that came to his knowledge through his representation of Porter. But the special rule is subject to the definitions that govern the privilege; it exists only for facts that came to the attorney's knowledge "by reason of the attorney-client relationship." *See* TEX. R. EVID. 503(b)(2) (protecting from disclosure any fact that came to the lawyer's knowledge through "the attorney-client relationship."). The special rule does not disregard the defining parameters of this relationship in what it means to act as an "attorney" and a "client." *Id.* 503(a)(1), (3). The "attorney-client relationship" exists between clients, who are defined as those seeking or accepting legal services, and lawyers, who are defined as those who are authorized to provide legal services. *See id.* Shelsy's removal and secretion of the bullet was not a legal service. Rather, he acted outside of his role as a lawyer by tampering with the crime scene. He did so in front of a witness and outside his client's presence. His knowledge of his own conduct in secreting evidence was not gained "by reason of" his attorney-client relationship with Porter, but through acts that he committed outside the scope of that relationship.

For this reason, Porter's reliance on *Sanford v. State*, 21 S.W.3d 337 (Tex. App.—El Paso 2000, no pet.), is misplaced. In *Sanford*, the defendant assaulted and kidnapped a former business associate using the associate's van to conduct the

13

kidnapping. *Id.* at 340. Shortly after the crime, a police investigator arrived at Sanford's attorney's office, while Sanford was meeting with the attorney. *Id.* at 341. The attorney stepped out of the meeting to speak with the investigator. *Id.* at 342. The attorney returned to his office and asked Sanford whether he knew the van's location. *Id.* Then, the attorney stepped out and told the investigator, "'It might be at the coliseum and it might have the keys in it.'" *Id.* The El Paso Court of Appeals observed that the attorney-client privilege did not prevent disclosure of the facts surrounding the van's location. *Id.* at 343–44. But, it held, the privilege did prohibit the State from introducing at trial that Sanford's attorney was the source of the information that led police to the van, because the attorney had been provided that information in a communication from his client. *Id.* at 344.

Unlike *Sanford*, this case does not involve the disclosure of an attorney-client communication. Fries testified to the circumstances surrounding the location of the bullet until the point that Shelsy removed it; Porter does not claim a privilege over the subject matter of Fries's eyewitness testimony. Shelsy's testimony was necessary because he removed and secreted the bullet. Because Shelsy's acts were unlawful, they cannot have been taken in furtherance of the attorney-client relationship between Porter and Shelsy. *See Clark*, 261 S.W.2d at 347 ("The rule of public policy which calls for the privileged character of the communication between attorney and client, we think, demands that the rule be confined to the legitimate

14

course of professional employment. It cannot consistent with the high purpose and policy supporting the rule be here applied."). Accordingly, we hold that Rule 503(b)(2) does not grant a privilege to protect these events from disclosure.

Finally, other than his discovery, secretion, and eventual destruction of the bullet, which the trial court established as the scope of the allowable testimony, Shelsy's testimony overlaps with Fries's testimony; thus, any error in failing to further limit it was rendered harmless by its admission elsewhere in the record. *See Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection."); *Duncan v. State*, 95 S.W.3d 669, 672 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (noting that any error in admitting evidence is cured where same evidence comes in elsewhere without objection).

Fries testified that she met with attorney "Shelby" at Inga's house. Fries took Shelsy into the living room. She testified that she told Shelsy that she saw Porter shoot Oncale on the living-room couch. She observed Shelsy inspect the couch, retrieve the bullet from that area, and put the bullet into his pocket. Shelsy's testimony was consistent with, and cumulative of, Fries's testimony on these issues.

## CONCLUSION

We hold that the trial court did not abuse its discretion in admitting Shelsy's testimony about his removal and secretion of the bullet, because these acts do not

15

fall within the attorney-client relationship, and knowledge of them was not gained by reason of that relationship. We therefore affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Justices Bland, Massengale, and Lloyd.

Publish.  TEX. R. APP. P. 47.2(b).